**IN THE CIRCUIT COURT FOR THE TWENTIETH JUDICIAL DISTRICT**
**DAVIDSON COUNTY, TENNESSEE**

| | | |
|---|---|---|
| **BABY DOE and BROTHER DOE; BABY ROE, BROTHER ROE, and SISTER ROE; and BABY SMITH, by and through their guardian *ad litem*,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **AMNEAL PHARMACEUTICALS, INC.; TEVA PHARMACEUTICALS USA, INC.; ALLERGAN FINANCES, LLC; ACTAVIS, LLC; ACTAVIS PHARMA INC.; WATSON LABORATORIES; JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON, INC.; AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; CVS PHARMACY, INC; CVS TN DISTRIBUTION, LLC; CVS INDIANA, LLC; TENNESSEE CVS PHARMACY, LLC; WALGREEN CO.; WALMART INC.; WAL-MART STORES EAST, L.P.; TIMOTHY ABBOTT; CINDY SCOTT; HEMAL MEHTA; HEATHER MARKS; JAMES MACCARONE; and DEL MAR MEDICAL, INC. d/b/a PARDUE'S PHARMACY,** | ) | **Civil Action No.: 3:22-cv-771**<br><br>**Chief Judge William Campbell, Jr.**<br>**Magistrate Judge Jeffrey Frensley**<br><br>**JURY DEMAND** |
| **Defendants.** | ) | |

**FIRST AMENDED COMPLAINT**

1. This is an action brought by six babies born dependent on opioids (collectively "the Baby Doe Plaintiffs"). From their first moments of life, they suffered from opioid withdrawal. They bring this action against major drug producers, drug distributors, pharmacy chains, and prescribers under the Tennessee Drug Dealer Liability Act ("DDLA") for their roles in facilitating the illegal opioid market that caused them harm.

## INTRODUCTION

2. The opioid epidemic poses an ongoing crisis in Tennessee. From 2012 to 2020 (the last year for which data has been reported), Tennessee set a new state record each year for the number of opioid overdose deaths, with 1,543 in 2019 and 2,388 in 2020.[1] According to IMS Health data, in 2015, there were also a staggering 7.8 million opioid painkiller prescriptions filled in the state – or 1.18 prescriptions for every man, woman, and child, placing Tennessee at number 2 in the nation among all states for the number of opioid prescriptions per capita. This trend continued, as evidenced by the CDC report, which showed that Tennessee providers wrote 68.5 opioid prescriptions per 100 persons in 2020, the third highest prescribing rate in the country and more than the average U.S. rate of 43.3 prescriptions.[2]

3. Along with overdose deaths, the number of babies born with neonatal abstinence syndrome ("NAS") - a condition suffered by babies born to mothers addicted to opioids - has also increased dramatically in Tennessee. In 2020 alone, there were 824 NAS births in Tennessee.[3]

---

[1] Tennessee Department of Health, Tennessee Drug Overdose Data Dashboard. Available at: https://www.tn.gov/health/health-program-areas/pdo/pdo/data-dashboard.html. (hereinafter "Tennessee Drug Overdose Data Dashboard").

[2] Center for Disease Control, *U.S. State Opioid Dispensing Rates, 2020* https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

[3] Tennessee Department of Health, *Neonatal Abstinence Syndrome (NAS),* https://www.tn.gov/health/nas.html (hereinafter "Tennessee NAS Dashboard").

4. The Baby Doe Plaintiffs were born dependent on opioids. They bring suit against people and companies that supplied and otherwise facilitated the illegal drug market in their community. These include:

a. The **"Producer Defendants"** Actavis LLC, Actavis Pharma, Inc., Allergan Finances, LLC, and Watson Laboratories, Inc. (collectively "Allergan"); Jannsen Pharmaceuticals, Inc. and Johnson & Johnson, Inc. (collectively "J&J); and Teva Pharmaceutical USA, Inc. ("Teva");

b. The **"Distributor Defendants"**: AmerisourceBergen Drug Corporation ("AmerisourceBergen") and Cardinal Health, Inc. ("Cardinal Health");

c. The **"Pharmacy Chain Defendants"**: CVS Pharmacy, Inc., CVS TN Distribution LLC, CVS Indiana, LLC, Tennessee CVS Pharmacy, LLC (collectively "CVS"), Walgreen Co. ("Walgreens") and Walmart Inc. and Wal-Mart Stores EAST, L.P. (collectively "Walmart");

d. The **"Pill Mill Defendants"**: Timony Abbott, Cindy Scott, Hemal Mehta, Heather Marks, James Maccarone, and Del Mar Medical, Inc. d/b/a PARDUE'S PHARMACY.

5. As described below, the Producer Defendants, the Distributor Defendants, the Pharmacy Chain Defendants, and the Pill Mill Defendants committed various acts that were intended to—and did—facilitate illegal diversion of their drugs.

6. Indeed, upon information and belief, Defendants spent years convincing suspicious doctors that prescription opioids' addictive properties had been overblown, aggressively marketing opioids, and/or filling suspicious orders and suspicious prescriptions even when these Defendants knew that millions of Americans and hundreds of thousands of Tennesseans were abusing and misusing prescription opioids. Defendants had to have known that entire regions of the country were being devastated by addiction to prescription drugs that they distributed. They also recognized or should have recognized that prescribers were writing – and pharmacies filling – volumes of opioids that necessarily were both creating and supplying large volumes of drug addicts

and pill seekers. Nevertheless, the Drug Producer Defendants, Drug Distributor Defendants, Pharmacy Chain Defendants, and Pill Mill Defendants persisted with distributing mind-boggling volumes of opioids into these same abuse-riddled communities.

7. Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[4] For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[5] If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain.[6]

8. Upon information and belief, the Producer Defendants, Distributor Defendants, and Pharmacy Chain defendants violated those Tennessee obligations, resulting in drugs that entered the illegal drug market. This included distributing drugs without maintaining necessary controls (rendering the distribution unlawful) and knowingly distributing those drugs into channels that they knew were resulting in diversion, and supplying opioids into Tennessee communities at levels that far exceeded any conceivable legitimate medical need, knowingly encouraging high-volume pill mill prescribers to prescribe opioids without a legitimate medical purpose, and supplying pharmacies serving pill mills.

---

[4] Tenn. Code Ann. § 39-17-407.

[5] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.

[6] *See* Tenn. Code Ann. § 53-11-401.[7] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune.com, Nov. 9, 2011. Available at: http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.

9. Upon information and belief, the Producer Defendants also committed various other acts intended to facilitate the illegal drug market including, inter alia:

a. waging a public campaign of misinformation concerning opioids (including through "key opinion leaders" and front groups);

b. encouraging prescribers to engage in prescription practices that the Producer Defendants knew and expected would drive up addiction rates;

c. repeatedly calling on and targeting the highest volume prescribers to prescribe more opioids while knowing that those prescribers were or were likely operating pill mills;

d. convincing naïve doctors willing to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale; devising marketing strategies to overcome prescribers' legitimate objections to prescribing opioids for long-term use and in higher doses;

e. convincing prescribers whom defendants knew were likely engaging in unlawful conduct and feeding the illegal drug market to prescribe even more opioids;

f. incentivizing sales representatives to do business both with pill mills and with pharmacies supplying pill mills through volume-based compensation (and financially rewarding those sales associates for doing so);

g. adding high-volume prescribers and pharmacies as customers without any (or adequate) due diligence, knowing that there was a strong likelihood that these high-volume businesses were running or supplying pill mills;

h. filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion;

i. filling suspicious orders without any investigation;

j. filling suspicious orders even where they met the Producer Defendants' own criteria for orders reflecting potential diversion;

k. filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation;

l. continuing to do business with prescribers and pharmacies that had a history of suspicious prescribing or ordering practices;

m. implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded;

n. continuing to target pill mill prescribers to prescribe more opioids and to target associated pharmacies that served them, even after being told by law enforcement that they were likely feeding the illegal drug market;

o. supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need; and

p. over-supplying Tennessee with opioids while recognizing that doing so would create addicts and expand the illegal drug market.

q. Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

10. Upon information and belief, the Distributor Defendants and the Pharmacy Chain Defendants committed similar acts that facilitated the diversion of drugs into the illegal drug market in Tennessee:

a. Failing to maintain effective controls against diversion as required by Tennessee law;

b. filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion;

c. filling suspicious orders without any investigation;

d. filling suspicious orders even where they met these Defendants' own criteria for orders reflecting potential diversion;

e. filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation;

f. continuing to do business with pharmacies that had a history of suspicious prescribing or ordering practices, or that the Defendants were aware were filling prescriptions for suspicious prescribers;

g. implementing sham suspicious order monitoring programs that were structured to fail;

h. supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need.

i. Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

11. Moreover, upon information and belief, everyone in the distribution chain collaborated to get around whatever sham suspicious order monitoring systems that the drug producers may have put in place by offering sham justifications for suspicious orders that everyone in the chain accepted without question, no matter how ludicrous – thereby giving the Producer Defendants, Distributor Defendants, and the Pharmacy Chain Defendants a convenient pretense to make, fill, and ship orders that they knew would supply the illegal drug market.

12. Upon information and belief, through this symbiotic relationship, they persisted in filling suspicious orders for large volumes of products, calling on suspicious prescribers and pharmacies, filling suspicious prescriptions, and/or otherwise shipping drugs to Tennessee communities ravaged by the opioid epidemic at levels far exceeding any conceivable need. They knew that their actions would cause (and in fact did cause) increased abuse, addiction, and overdose rates in Tennessee. They also knew or should have known that their actions facilitated illegal drug transactions in Tennessee.

13. The Pill Mill Defendants also facilitated the illegal opioid market in Tennessee. They knowingly supplied suspicious quantities of opioids to patients that exhibited blatant red flags of diversion. They knowingly failed to implement effective controls and procedures to guard against the diversion of opioids. Each Pill Mill Defendant knew that the amount of opioids they were prescribing/dispensing were not medically justified, and each became popular destinations for drug addicts and dealers to obtain opioids. Their actions fueled the illegal drug market in the Baby Doe Plaintiffs' community.

14. Defendants' misconduct garnered significant profits. In 2010 alone, opioids generated $11 billion in revenue for drug companies.[7] Opioids are now among the most prescribed class of drugs and the United States' opioid painkiller market is worth an estimated $10 billion annually.[8] According to Fortune magazine, the Distributor Defendants are each among the top 15 companies in the 2022 Fortune 500: AmerisourceBergen, No. 10, with $213 billion in total revenue; and Cardinal Health, No. 15, with $162 billion in total revenue.[9]

15. The Baby Doe Plaintiffs now sue to recover damages for which Defendants are liable under the DDLA.

## JURISIDICTION AND VENUE

16. Jurisdiction is proper pursuant to Tenn. Code Ann. § 16-10-101, *et seq.*, and Tennessee's Drug Dealer Liability Act, Tenn. Code Ann. § 29-38-101, *et seq.* The Baby Doe Plaintiffs were all born in Davidson County, Tennessee. Their birth mothers used and made unlawful purchases of drugs in Davidson County.

17. Venue is proper pursuant to Tenn. Code Ann. § 20-4-101 because the Baby Doe Plaintiffs were born in Davidson County, reside in Davidson County, and their birth mothers purchased and consumed illegal opioids in Davidson County.

## PARTIES

### A. Plaintiffs

[7] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune.com, Nov. 9, 2011. Available at: http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.
[8] Ariana Eunjung Cha, *The drug industry's answer to opioid addiction: More pills*, The Washington Post, Oct. 16, 2016. Available at: https://www.washingtonpost.com/national/the-drug-industrys-answer-to-opioid-addiction-more-pills/2016/10/15/181a529c-8ae4-11e6-bff0-d53f592f176e_story.html?utm_term=.42e0328ca459.
[9] https://fortune.com/fortune500/2022/search/

18. The Baby Doe Plaintiffs are six children between the ages of 2 and 8.

19. Plaintiffs BABY DOE and BROTHER DOE were born with NAS as a result of their exposure *in utero* to illegal drugs, including but not limited to Opana, Roxicodone, hydrocodone, hydromorphone, oxycodone, and other opioids. These drug exposures provide them with the right to sue for damages under the DDLA.

20. Plaintiffs BABY ROE, BROTHER ROE, and SISTER ROE were born with NAS as a result of their exposure *in utero* to illegal drugs, including but not limited to Opana, Percocet, Roxicodone, Lortab, hydrocodone, oxycodone, fentanyl, and other opioids. These drug exposures provide them with the right to sue for damages under the DDLA

21. Plaintiff BABY SMITH was born with NAS as a result of his exposure *in utero* to illegal drugs, including but not limited to Percocet, Lortab, hydrocodone, oxycodone, and other opioids. These drug exposures provide him with the right to sue for damages under the DDLA.

22. The Baby Doe Plaintiffs bring this action by and through their guardian *ad litem*. Legal guardians of children exposed to illegal drugs *in utero* are authorized to bring this action under the DDLA. Tenn. Code Ann. § 29-38-106(a)(1).

**B. <u>The Drug Producer Defendants</u>**

**1. Allergan**

23. Defendant ALLERGAN FINANCES, LLC (f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.) ("Allergan Finances") is a Nevada limited liability company that exists for the purpose of holding shares of other companies that manufacture and distribute prescription pharmaceuticals.

a. The sole member of Allergan Finances is Allergan W.C. Holding Inc. f/k/a Actavis.

b. W.C. Holding Inc. is a Delaware corporation with its principal place of business in Madison, New Jersey. It is a wholly owned, indirect subsidiary of Allergan PLC.

24. Defendant WATSON LABORATORIES, INC. ("Watson") is a Nevada corporation with its principal place of business in Corona, California.

25. Defendant ACTAVIS PHARMA, INC. (f/k/a Watson Pharma, Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey.

26. Defendant ACTAVIS LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in New Jersey.

27. Before August 2016, Allergan plc owned Watson, Actavis Pharma, and Actavis LLC. During that time, Watson, Actavis Pharma, and Actavis Pharma LLC were part of the same corporate family as Allergan Finances. Those companies sold and marketed opioids as part of a coordinated strategy to sell and market opioids (both branded and generic).

28. For the time frame before August 2016, the term "Allergan" in this pleading refers only to Actavis Pharma and Actavis LLC.

29. In August 2016, Teva Pharmaceuticals Industries Ltd. purchased Watson, Actavis Pharma, and Actavis LLC. For the time August 2016 forward, the term "Allergan" includes these entities.

**2. J&J**

30. Defendant JOHNSON & JOHNSON, INC. is a New Jersey corporation that is headquartered in New Jersey.

31. Defendant JANSSEN PHARMACEUTICALS, INC. (formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc.) is a Pennsylvania corporation headquartered in New Jersey. Janssen is a

wholly-owned subsidiary of Johnson & Johnson, which controls the sale and development of Janssen's drugs. Janssen's profits inure to Johnson & Johnson's benefit. Janssen and Johnson & Johnson are collectively referred to herein as "J&J."

**4. Teva**

32. TEVA PHARMACEUTICALS USA, INC. ("TPUSA") is a Delaware corporation with its principal place of business in North Wales, Pennsylvania.

33. TPUSA is a wholly owned subsidiary of Teva Pharmaceuticals Industries, Ltd. ("TPIL"), an Israeli corporation.

34. Cephalon, Inc. ("Cephalon") is also a wholly owned subsidiary of TPIL.

35. In August 2016, TPIL bought Actavis Pharma and Actavis LLC from Allergan Plc.

36. Thus, since August 2016, TPIL has owned the generic business that was formerly owned by Allergan.

37. This pleading refers to TPUSA, TPIL, Actavis Pharma, Actavis LLC, and Cephalon collectively as "Teva."

38. Inclusive of companies and product lines it has acquired, Teva develops, markets, and sells prescription drugs, including opioids.

39. In 2011, Teva purchased Cephalon, which was manufacturing a branded opioid called "Actiq" (a branded opioid containing fentanyl) and Fentora (an oral tablet form of fentanyl).

40. Teva marketed and sold both Actiq and Fentora in Tennessee.

41. In 2016, Teva purchased Actavis, which produces generic opioids.

42. In Tennessee and nationally, Teva is engaged in the production, promotion, and distribution of generic opioids, including hydrocodone and oxycodone among other drugs.

**C. <u>The Drug Distributor Defendants</u>**

### 1. AmerisourceBergen

43. Defendant AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") is a Delaware corporation with its principal place of business located at 1300 Morris Drive in Chesterbrook, Pennsylvania 19087.

44. At all relevant times, AmerisourceBergen and its affiliates were licensed as wholesaler/distributors in Tennessee.

45. AmerisourceBergen, through various subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

46. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

47. The illegal drug market in those communities would have included pills distributed by AmerisourceBergen.

48. AmerisourceBergen is the second largest pharmaceutical distributor in North America.

49. According to its 2016 Annual Report, AmerisourceBergen is "one of the largest global pharmaceutical sourcing and distribution services companies, helping both healthcare providers and pharmaceutical and biotech manufacturers improve patient access to products and enhance patient care."

50. In 2018, AmerisourceBergen was the 11th largest company by revenue in the United States.

51. AmerisourceBergen established direct relationships with Tennessee pharmacies, including (upon information and belief) in the Baby Doe Plaintiffs' community.

### 2. Cardinal

52. Defendant CARDINAL HEALTH, INC. ("Cardinal") is an Ohio Corporation with its principal place of business in Dublin, Ohio.

53. At all relevant times, Cardinal and its affiliates were licensed as wholesalers/distributors in Tennessee.

54. Cardinal, through various subsidiaries and affiliated entities, is a wholesaler of pharmaceutical drugs that distributes prescription opioids throughout the country.

55. This has included distributing prescription opioids for the Producer Defendants (and others) into Tennessee and into the communities in which each Baby Doe was born.

56. The illegal drug market in those communities included pills distributed by Cardinal.

57. Upon information and belief, Cardinal Health established direct relationships with Tennessee pharmacies, including in the Baby Doe Plaintiffs' community.

**D. <u>The Pharmacy Chain Defendants</u>**

**1. CVS**

58. Defendant CVS PHARMACY, INC. ("CPI") is a Rhode Island corporation with its headquarters and principal place of business in Woonsocket, Rhode Island.

59. Defendant CVS TN DISTRIBUTION LLC (f/k/a CVS TN Distribution, Inc.) ("CVS TN Distribution") is a Tennessee limited-liability corporation with a principal office in Woonsocket, Rhode Island.

a. CVS TN Distribution is a subsidiary of CPI.

b. CVS TN Distribution holds a wholesaler/distributor license in Tennessee and held that license at all relevant times.

c. Upon information and belief, CVS TN Distribution distributed prescription opioids to CVS-branded pharmacies in Tennessee at all relevant times.

60. Defendant CVS INDIANA, LLC is an Indiana corporation and a subsidiary of CVS Pharmacy, Inc.

61. Defendant TENNESSEE CVS PHARMACY, LLC is a Tennessee limited-liability corporation with its principal place of business in Woonsocket, Rhode Island.

62. Tennessee CVS Pharmacy, LLC is a subsidiary of CPI.

63. Collectively, CPI, CVS TN Distribution, CVS Indiana, and Tennessee CVS Pharmacy are collectively referred to as "CVS."

64. CVS self-distributed opioids to its pharmacy locations in Tennessee.

65. Upon information and belief, it self-distributed to those pharmacies at least through TN CVS Distribution.

### 2. Walgreens

66. Defendant WALGREEN CO. ("Walgreens") is a Delaware corporation with its headquarters and principal place of business located in Deerfield, Illinois.

67. Walgreens self-distributed opioids to its locations in Tennessee.

68. At all times relevant, Walgreens has been licensed as a wholesaler/distributor in Tennessee.

### 3. Walmart

69. Defendant WALMART INC. (f/k/a Wal-Mart Stores, Inc.) is a multinational retail corporation incorporated in the State of Delaware.

70. Defendant WAL-MART STORES EAST, L.P. is a Delaware corporation that holds the DEA registrations for its parent company's distribution centers.

71. Collectively, these entities are referred to as "Walmart."

72. Walmart self-distributed opioids to its pharmacy locations in Tennessee.

73. At all times relevant, Walmart, directly or through affiliates, has been licensed as a wholesaler/distributor in Tennessee.

**E. <u>The Pill Mill Defendants</u>**

**1. Timothy Abbott**

74. Defendant TIMOTHY ABBOTT is a resident of Davidson County, Tennessee.

75. Abbott was a licensed podiatrist in Tennessee from 1986 until his license was revoked by the State of Tennessee in June 2020.

76. Abbott participated in the illegal drug market for opioids by running a pill mill in Davidson County, conduct which resulted in him pleading guilty to seven counts of unlawfully distributing opioids under the Controlled Substances Act.

**2. Cindy Scott**

77. Defendant CINDY SCOTT is a resident of Davidson County, Tennessee.

78. Scott was a registered nurse and advanced practice nurse who was licensed in Tennessee from 2004 until she was placed on probation by the State of Tennessee in November 2016.

79. Scott participated in the illegal drug market for opioids by helping run pill mills in and around Davidson County, conduct which resulted in her being placed on probation by the State of Tennessee and being required to surrender her DEA registration by the United States Department of Justice.

**3. Hemal Mehta and Heather Marks**

80. Defendant HEMAL MEHTA is a resident of Williamson County, Tennessee who has been licensed to practice medicine in Tennessee since 2004.

81. Mehta has practiced medicine in the Nashville Metro Area, including practicing in Davidson County and treating Davidson County residents.

82. Defendant HEATHER MARKS is a resident of Rutherford County, Tennessee.

83. Marks has been licensed as an Advanced Practice Registered Nurse in Tennessee since 2015.

84. She has practiced medicine in the Nashville Metro Area, including treating Davidson County residents.

85. Mehta and Marks participated in the illegal drug market for opioids by operating a pill mill in the Nashville Metro Area. Both Mehta and Marks were indicted on federal drug charges for the unlawful distribution and conspiracy to distribute oxycodone and oxymorphone.

**4. James Maccarone**

86. Defendant JAMES MACCARONE is a resident of Montgomery County, Tennessee who was licensed to practice medicine in Tennessee from 2007 until February 2022.

87. Maccarone participated in the illegal drug market for opioids by operating a pill mill which issued opioid prescriptions that were filled in and around Davidson County. He pled guilty to conspiracy to unlawfully distribute opioids in violation of the federal Controlled Substances Act.

**5. Pardue's Pharmacy**

88. Defendant DEL MAR MEDICAL, INC. d/b/a PARDUE'S PHARMACY ("Pardue's") is a for-profit Tennessee corporation.

89. Pardue's which operates multiple pharmacy locations in Davidson County and the Nashville Metro area, including Pardue's Pharmacy at 1900 Patterson Street, Suite 200, Nashville,

Tennessee 37203 (which it purchased in 2017 following the death of its original owner, Wendell Pardue).

90. Pardue's is one of Davidson County's largest dispensers of opioids. Pardue's regularly engaged in suspicious ordering patterns and dispensed opioids for prescriptions written by notorious pill mill prescribers.

## SCIENTIFIC BACKGROUND

### A. Opioids Have Never Been Proven Appropriate for Long-Term Chronic Pain and Other Non-Acute Medical Problems

91. This case primarily, but not exclusively, concerns the following four types of opioids:

a. Oxycodone: Oxycodone is a powerful type of opioid. It can be prescribed as oxycodone or more specifically branded by a company, such as OxyContin or Roxicodone.

b. Hydrocodone: Hydrocodone is also a type of opioid. It can be prescribed as hydrocodone or more specifically branded by a company, such as Lortab or Vicodin.

c. Oxymorphone: Oxymorphone is also a type of opioid. It can be prescribed as oxymorphone or more specifically branded by a company, such as Opana and Opana ER.

d. Hydromorphone: Hydromorphone is also a type of opioid. It can be prescribed as hydromorphone or more specifically branded by a company, such as Exalgo.

92. The scientific consensus is that opioids such as these are dangerous, highly addictive, and inappropriate for long-term chronic pain – as opposed to cancer pain and pain associated with surgery and acute injuries. This opinion existed in the mid-1990s and has never been challenged in any meaningful way with new, valid scientific evidence.

93. The National Safety Council, a not-for-profit organization chartered by Congress to improve public health, has published a summary of research titled "Evidence for the Efficacy

of Pain Medications."[10] The National Safety Council report concludes that "[d]espite the widespread use of opioid medications to treat chronic pain, there is no significant evidence to support this practice."[11]

94. Multiple researchers have found that "no evidence exists to support long term use—longer than four months—of opioids to treat chronic pain."[12]

95. A 2013 review of existing literature by Dr. Igor Kissin of the Department of Anesthesiology, Perioperative, and Pain Medicine at Brigham and Women's Hospital, Harvard Medical School, concluded that "[n]ot a single randomized controlled trial with opioid treatment lasting [greater than] 3 months was found."[13]

96. The same review found that "[a]ll studies with a duration of opioid treatment [greater than or equal to] 6 months were conducted without a proper control group."[14]

97. Dr. Kissin further concluded that "[t]here is no strong evidence-based foundation for the conclusion that long-term opioid treatment of chronic malignant pain is effective."[15]

**B. <u>Opioids Carry a High Risk of Addiction, Serious Medical Problems, and Death</u>**

98. Opioids have severe side effects, including gastrointestinal bleeding, impaired recovery from injury or surgery, cognitive impairment, respiratory depression, endocrine

---

[10] Dr. Donald Teater, Nat'l Safety Counsel, *Evidence for the Efficacy of Pain Medications*, 3 (2014) (hereinafter Evidence for Efficacy).
[11] *Id.* at 6.
[12] *Id.* (citing multiple publications)
[13] Dr. Igor Kissin, *Long-term Opioid Treatment of Chronic Nonmalignant Pain: Unproven Efficacy and Neglected Safety?*, 2013:6 J. Pain Research 513, 513 (2013), available at https://www.dovepress.com/long-term-opioid-treatment-of-chronic-nonmalignant-painnbspunproven-ef-peer-reviewed-article-JPR.
[14] *Id.*
[15] *Id.*

abnormalities, hyperalgesia (increased sensitivity to pain), increased risk of fractures and hospitalization for the elderly, addiction, and death.[16]

99. Research based on actual patient interviews has found that, ***among patients who received four or more prescriptions in the prior year, 35% met the criteria for a lifetime opioid dependence, and 25.8% met the criteria for current opioid dependence***.[17]

100. Dr. Nora D. Volkow and Dr. Wilson M. Compton, the Director and Deputy Director of the National Institute of Drug Abuse at the National Institute of Health, respectively, co-authored a 2006 study that concluded: "[t]hough the use of opioid analgesics for the treatment of acute pain appears to be generally benign, ***long-term administration of opioids has been associated with clinically meaningful rates of abuse or addiction***."[18]

101. Consistent with this finding, a 2011 review of medical and pharmacy claims records revealed that two thirds of patients who took opioids daily for ninety days were still taking opioids five years later.[19]

102. Researchers evaluating opioids for treatment following lumbar disc herniation likewise found that giving such patients opioids had no effect on treatment outcome, but significantly increased their risk for long term opioid addiction.[20]

---

[16] Dr. Donald Teater, Nat'l Safety Council, *The Psychological and Physical Side Effects of Pain Medications*, 2-6 (2014) (summarizing side effect data). (hereinafter *Side Effects*).

[17] Joseph A. Boscarino, *Opioid-Use Disorder Among Patients on Long-Term Opioid TherapyI*, 2015:6 Substance Abuse and Rehabilitation 87, 87-89 (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4548725/.

[18] Wilson M. Compton et al., *Major Increases in Opioid Analgesic Abuse in the United States: Concerns and Strategies*, 81 Nat'l Inst. on Drug Abuse 103, 103-07 (2006) (emphasis added).

[19] Bradley C. Martin et al., *Long-term Chronic Opioid Therapy Discontinuation Rates from the TROUP Study*, 26(12) J. Gen. Intern. Med. 1450, 1450-57 (2011).

[20] Evidence for Efficacy at 5 (citing Radcliff et al., Does Opioid Pain Medication Use Affect the Outcome of Patients with Lumbar Disk Herniation?, 38(14) The Spine J. E849, E849-60 (2013)).

103. Dr. Mitchell H. Katz, current President and CEO of the New York City Health and Hospitals (the largest public healthcare system in the United States), has described how patients with nonmalignant conditions can end up as drug addicts because of the prescribing of opioids:

> A certain number of patients get better with NSAIDs [non-steroidal anti-inflammatory drugs, like Tylenol]. For those still complaining of pain, you next prescribe a short-acting opioid with a relatively low potency, such as acetaminophen with codeine. …You tell them about the adverse effects of opioids and encourage them to use the lowest dose necessary. Not infrequently, at the next visit they tell you that the medicine works but that they are taking the pills more frequently than directed. At this point, you worry about liver damage from the acetaminophen and switch to a higher potency, longer acting agent. The patient returns for follow-up visits and tells you that the pills work but that they sometimes take an extra pill and could you please increase the number so they "don't run out before the next visit." Before you know it, the patient is on a high dose of an opioid, and you are unsure whether you have actually helped them. ***What you know is you have committed yourself to endless negotiations about increasing doses, lost pill bottles, calls from emergency departments, worries that your patient is selling the drugs, and the possibility that one day, your patient will take too many pills, perhaps with alcohol, and overdose***.[21]

## MATERIAL FACTS

### A. Overview: The Defendants Created the Illegal Drug Market Through Unlawful Distribution and Otherwise Knowingly Supplied and Knowingly Participated in the Illegal Drug Market in Tennessee

104. Controlled substances are, by definition, highly subject to abuse and diversion. For this reason, Tennessee regulates every participant in the chain of distribution. No one can distribute or dispense prescription opioids in Tennessee without maintaining effective controls against diversion and ensuring that the drugs are serving a lawful medical purpose. Indiscriminate distribution without sufficient controls is unlawful and can lead to criminal penalties in Tennessee.

---

[21] Mitchell H. Katz, *Long-term Opioid Treatment of Nonmalignant Pain: A Believer Loses His Faith*, 170(16) Arch Intern. Med. 1422, 1422-24 (2010) (emphasis added).

105. Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[22]

106. For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[23]

107. If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee.

108. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain.[24]

109. In sum, in Tennessee, all licensed entities in the distribution chain were to maintain effective controls against diversion, and to meet that obligation were required to (A) design and operate a system to identify suspicious orders; (B) report suspicious orders, and (c) stop shipment of suspicious orders pending appropriate investigation and due diligence.

110. Upon information and belief, and as described, each Defendant involved in the distribution chain violated one or more these Tennessee duties.

111. In particular, upon information and belief, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knowingly distributed drugs into Tennessee without effective diversion controls. Upon information and belief, knew or should have known that they

---

[22] Tenn. Code Ann. § 39-17-407.

[23] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.

[24] *See* Tenn. Code Ann. § 53-11-401.

were feeding pill mills and the black market rather than legitimate medical need.[25] That conduct was unlawful. Even in isolation, it subjects them to liability under the DDLA.

112. The Pill Mill Defendants also participated in the illegal drug market by issuing and filling prescriptions for no legitimate medical purpose.

113. At every step, these Defendants supplied drugs into the illegal market, to continue over-supplying Tennessee communities at levels that were not medically justifiable, and enjoy profits derived from the illegal distribution of opioids.

### B. The Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants Have All Participated in the Distribution Pipeline for Opioids in Tennessee and in the Baby Doe Plaintiffs' Community

#### 1. The Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants Possessed Information Reflecting Diversion by Prescribers and Pharmacies but Facilitated that Diversion Anyway

114. As described herein, the Drug Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants did not maintain effective controls against diversion (rendering their actions illegal), and they otherwise engaged in many other acts to facilitate diversion of their drugs illegally. They also plainly undertook actions in Tennessee or directed at Tennessee that they knew or should have known were detrimental to public health and safety.

115. The related crises of abuse and illegal diversion of prescription opioids in Tennessee is well-documented in a variety of publicly available sources. Indeed, the prescription statistics reflect how the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants each are participating in the unconscionable flow opioids into Middle Tennessee.

[25] As noted in ¶ 2 above, this conduct does not encompass opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.[26]

116. Upon information and belief, through their market research and extensive networks of sales representatives and face-to-face detailing of health care providers ("HCP"), the Drug Producer Defendants could, and did, observe signs of illegal diversion.

117. The Drug Producer Defendants also possess information called "chargeback" data from their distributors. As reported in the Washington Post, there is an "industry-wide practice" whereby pharmaceutical drug producers pay their distributors rebates and/or "chargebacks" on prescription opioid sales.[26] In return, the distributors provide the Drug Producer Defendants with downstream purchasing information, which allows them to track their prescription opioids down the entire supply chain, all the way to the retail level.[27]

### 2. <u>Allergan Knowingly Participated in Tennessee's Illegal Drug Market</u>

118. Allergan was one of the two largest manufacturers of generic opioids. Because Allergan lacked a meaningful suspicious order monitoring program, its opioids flooded the market without pause, worsening the opioid epidemic.

119. Allergan's promotional spending on opioids, which was virtually nonexistent in the 2004-2008 period, began to sharply rise in 2009, when it began marketing Kadian. The third quarter of 2011 saw a peak of $3 million and nearly $7 million for the year.

120. To ensure that these messages reached individual physicians, Allergan deployed sales representatives to visit HCPs in Tennessee and across the country. Allergan chose its detailing targets based on the likelihood of higher numbers of prescriptions at higher doses, with

---

[26] Lenny Bernstein & Scott Higham, *The Government's Struggle to Hold Opioid Manufacturers Accountable*, Wash. Post, April 2, 2017, available at: https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/

[27] *Id.*



Case 3:22-cv-00771 Document 135 Filed 04/14/25 Page 23 of 119 PageID #: 3088

no consideration as to the risk of misuse. Allergan carefully tracked the prescription trends of the HCPs whom it detailed.

121. Allergan trained its sales representatives to deceptively minimize the risk of addiction by: (1) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (2) emphasizing the difference between substance dependence and substance abuse; and (3) promoting the unsupported term "pseudoaddiction."

122. Allergan misleadingly instructed its sales team that opioid doses could be escalated during long-term opioid therapy, without hitting a dose ceiling, which purportedly made them safer than other forms of therapy such as acetaminophen or NSAIDs.

123. Allergan also actively marketed its generic drugs. Prior to the sale of its generic business to Teva, Allergan's marketing strategy included promotion of its generic opioids, including generic Kadian (morphine sulfate), directly to HCPs. Allergan sales representatives received bonuses for both branded and generic Kadian sales, and used the same selling points for both versions of the drug, available in many leading pharmacies, advertising that the generic had the same features and benefits as the branded product.

124. Allergan also promoted its generic Opana ER (oxymorphone ER). Allergan saw a business opportunity due to Endo discontinuing certain dosages and Endo production issues, and began training and deploying the Kadian sales force to detail doctors to promote generic Opana ER. Allergan also paid bonuses to its sales team for meeting sales goals for generic Opana ER.

125. Allergan also promoted its generics through direct mail and email campaigns and journal advertisements aggressively marketed its generic opioids through its distributors.

126. Allergan collaborated with Distributor Defendants Cardinal and ABC to promote Allergan's generic opioids through targeted telemarketing and direct mail campaigns aimed at

pharmacies. Allergan collaborated with ABC in an initiative to drive generic conversion at a faster rate than what would occur without its intervention.

127. Allergan also worked with Walgreens to send a letter to patients who had filled a prescription for Opana ER within the prior year, informing them that although Endo no longer manufactured certain dosages of Opana ER, a generic was now available from Allergan.

128. Through its aggressive marketing, Allergan expanded the market for opioids in Tennessee.

129. As an entity registered with the Tennessee Board of Pharmacy, Allergan knew it was required to maintain effective controls against diversion of opioids and to report suspicious orders.

130. Upon information and belief:

a. Allergan failed to put in place appropriate procedures to ensure that suspicious orders—orders of unusual size, frequency, or those deviating from a normal pattern—would be reported to governmental authorities as required by law in Tennessee.

b. Allergan (for its entities both pre- and post-merger) did not maintain effective controls against diversion as required by Tennessee law, and used a SOM system that was not meaningfully designed to detect and halt suspicious orders.

c. Allergan continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

d. Allergan possessed ample sources of data that allowed it to detect and report suspicious orders of opioids, both from its direct and indirect customers. The company's sales representatives regularly visited pharmacies and HCPs to promote Allergan's products, which allowed them to observe red flags of diversion.

131. Despite these available sources of information regarding potential diversion, Allergan failed to properly design and operate a system that would be capable of detecting suspicious opioid orders. Prior to 2011, any process that Allergan had that could be considered an

opioid order monitoring system was not even properly automated. After 2011, Allergan finally began to acknowledge its responsibility to create an opioid order monitoring system, but the procedures it put in place were severely lacking, and were focused on approving—not restricting—orders of excessive quantities of opioids.

132. To the extent Allergan established thresholds to detect suspicious orders, they were wholly inadequate.

133. Allergan failed to perform appropriate due diligence on its customers, both generally and at the time it should have been alerted to a suspicious order.

134. Allergan failed to stop shipments after it knew or should have known that opioid orders remained suspicious, had no requirement to stop shipments on suspicious indirect sales, and failed to report suspicious orders to the DEA. Eventually, Allergan ceased operating any suspicious order monitoring program at all, when it "outsourced" those duties to a distributor.

135. Upon information and belief, Allergan failed to discontinue detailing HCPs who were suspected of diversion. On the contrary, Allergan chose its detailing targets based on the likelihood of higher numbers of prescriptions.

### 3. J&J Knowingly Participated in Tennessee's Illegal Drug Market

136. J&J manufactures, markets, sells, and distributes the following opioids in Davidson County, in Tennessee, and nationwide: Duragesic (fentanyl patch), Nucynta ER (tapentadol hydrochloride), and Nucynta (tapentadol hydrochloride), both of which are Schedule II narcotics.

137. J&J introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." After seeing the success of

OxyContin for chronic non-cancer pain, J&J re-launched Duragesic for chronic non-cancer pain as well.

138. J&J also marketed Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution, and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older. J&J also marketed Nucynta ER ,which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of…pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." This pain indication was later altered to "management of moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."

139. J&J instructed sales representatives to market Duragesic as having better efficacy, better tolerability, and better patient compliance because it was a patch instead of a pill. These sales representatives were instructed to tell doctors that the patch provided better control in the event of patient opioid abuse because patients could not increase the patch dosage. However, sales representatives were aware of patients who increased the dosage by applying more than one patch at a time and were also aware that some patients abused the patch by freezing then chewing on it.

140. These tactics extended to J&J's promotion of Nucynta, wherein J&J trained its sales representatives to avoid the so-called "addiction ditch"—i.e., to avoid the negatives (addiction) and emphasize the positives (supposed efficacy) in sales calls—and to use a study from Dr. Portenoy "to create dialogue about Opiophobia as a barrier."

141. J&J further trained their sales representatives that there was a 2.6% or lower risk of addiction when using opioids prescribed by a doctor. As part of this same training, J&J trained its sales representatives to "establish that moderate to severe acute pain continues to be undertreated."

142. However, upon information and belief, J&J did not provide its sales force with any training on opioid addiction, but rewarded them with bonuses for targeting high-volume opioid prescribers

143. As part of its "pain management franchise" from the 1990s through at least 2016, Johnson & Johnson wholly owned Tasmania Alkaloids Limited ("Tasmania Alkaloids"), which was based in Tasmania and cultivated and processed opium poppy plants to manufacture narcotic raw materials to be imported into the U.S. to be processed and made into active pharmaceutical ingredients ("APIs") necessary to manufacture opioid drugs. It also wholly owned Noramco, Inc. which is based in Athens, Georgia and imported the raw narcotic materials produced by Tasmania Alkaloids, processed the materials into APIs, then sold the APIs to other opioid manufacturers in the U.S. J&J, through these subsidiaries, supplied the following APIs to other drug manufacturers in the U.S.: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone. J&J had supply agreements to sell controlled substance API with all 7 of the top U.S. generic companies as we as many of the top branded opioid producers.

144. J&J, acting in concert with others, embarked on a major campaign in which it used branded and unbranded marketing to disseminate the messages that pain was bring undertreated and that there was a low risk of abuse and a low danger of prescribing opioids to treat chronic, non-malignant pain and overstating the efficacy of opioids as a class of drug. J&J funded literature in medical journals and publications, materials from professional societies/patient advocacy groups, continuing medical education, unbranded marketing materials, and paid speakers. It also partnered with third-party advocacy groups or academic groups to hold seminars, symposiums, and conferences to influence prescriber behavior and increase profits from opioids.

145. J&J trained its sales representatives to target high-opioid prescribing physicians, including pain specialists and primary care physicians.

146. J&J did not train its sales representative regarding red flags that could indicate a "pill mill," including pain clinics with patients lined up out the door or patients passed out in the waiting room. Upon information and belief:

a. Through its sales force, J&J had visibility, on both macro and micro levels, of how overprescribed branded and generic opioids and that they were ending up on the black market; however, J&J continued supplying these materials to opioid producers which helped fuel the illegal opioid market.

b. J&J failed to design and operate a system to monitor suspicious orders of controlled substances, and otherwise violated its obligation under Tennessee law to maintain effective controls against diversion.

c. J&J continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

d. J&J shipped orders that it knew or should have known were suspicious.

e. J&J did not report orders that it knew or should have known were suspicious.

f. J&J shipped orders despite the orders being suspicious.

147. Also, upon information and belief, J&J knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were engaging

in suspicious activity; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

#### 4. <u>Teva Knowingly Participated in Tennessee's Illegal Drug Market</u>

148. Teva's generic oxycodone and hydrocodone products both represented the largest market share for either product throughout Tennessee according to IMS Health Data.

149. These quantities of opioid pills clearly exceeded the number that would have been appropriate for normally prescribed therapeutic use.

150. Teva also knowingly participated in the illegal drug market in Tennessee by supplying suspicious quantities of its products to suspect physicians and pharmacies in Tennessee, without disclosing suspicious orders as required by applicable regulations.

151. According to IMS data, from September 2015 to August 2016, Teva accounted for 33.5% of the hydrocodone prescribed in Tennessee, 28.8% of the oxycodone prescribed in Tennessee, 16.8% of the oxymorphone, and 1.6% of the hydromorphone. This amounted to 1,913,712 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 3.5 Tennesseans during that year.

152. During the same timeframe of September 2016 through August 2017, Teva accounted for 32.3% of Tennessee hydrocodone prescriptions, 25.1% of its oxycodone prescriptions, 1.8% of its oxymorphone prescriptions, and 1.8% of its hydromorphone prescriptions. This amounted to 1,619,143 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 4.1 Tennesseans during that year.

153. Teva's role relative to branded drugs involved knowing participation in the illegal drug market. Cephalon, a pharmaceutical company purchased by Teva in 2011, sold two opioid

drugs, Actiq and Fendora. As part of the approval process for Actiq the FDA required a risk management program (RMP) for the marketing of the drug. The RMP for Actiq in 1998 specifically included special adverse event reporting for adverse events related to "unintended pediatric exposure," "diversion (i.e., use by an individual other than for whom it was prescribed)," or "in the context of 'off label use'". As of 2001, the FDA further informed Cephalon that it had concerns that its fentanyl-based drug, Actiq, might be used by patients who were not indicated for its use and that there was potential for diversion and abuse of the drug. In 2006 The Wall Street Journal reported that Actiq, a fast-acting lollipop like oral analgesic that contained fentanyl, was reportedly being called "perc-a-pop" on the street.[28]

154. In 2005, Cephalon knew that 90% of Actiq prescriptions were for off-label use, and 55% of that total were for chronic back pain. From 2000 to 2006, sales of Actiq grew from $15 million to over $400 million a year.[29] The Wall Street Journal further reported that surveys from research firm ImpactRx from June 2005-October 2006 found that more that 80% of patients who use the drug don't have cancer.[30]

155. In 2006, as Actiq was losing its patent protection as a branded drug, Cephalon began marking a new fentanyl-based drug to replace it, called Fentora. Fentora, like Actiq, was only ever approved by the FDA for the treatment of breakthrough cancer pain. As part of the FDA approval of Fentora, Cephalon again was required to agree to a risk management program or RiskMAP, including a plan to monitor, evaluate and determine the incidence of use of Fentora by opioid intolerant individuals, misuse of Fentora, and unintended (accidental) exposure to Fentora.

---

[28] John Carreyrou, *Narcotic 'Lollipop Becomes Big Seller Despite FDA Curbs*, Wall Street Journal, Nov. 3, 2006, available at: https://www.wsj.com/articles/SB116252463810112292.
[29] *Id.*
[30] *Id.*

156. In November 2007, Cephalon submitted a supplemental New Drug Application (sNDA) to the FDA requesting that the FDA approve Fentora for use in non-cancer opioid tolerant patients with breakthrough pain. The FDA denied Cephalon's request, explaining that "[i]n the face of a national crisis of prescription opioid abuse and misuse, it is critical that you provide a risk management program with established efficacy [and] adequate restrictions to avoid widespread abuse and misuse."[31] The FDA's letter to Cephalon denying its request addressed the complete failure of the company to address the abuse and misuse of both its potential and its existing products:

> [Y]ou have not adequately addressed the public health concern of increased abuse, misuse, overdose and addiction that is to be expected with more widespread availability of this product in the community. Your proposed plan to mitigate these risks has not been adequately tested to assure that it will, indeed, achieve this outcome for your currently approved indication, let alone the proposed expanded indication.[32]

These problems were never resolved by Cephalon in an amended application and the FDA never approved Fentora for expanded use beyond cancer pain.

157. Teva expanded its opioid business beyond Actiq and Fentora when it bought pharmaceutical company Actavis, which produces several generic opioids, mainly hydrocodone-acetaminophen and oxycodone-acetaminophen. Those types of opioids are prevalent in Tennessee.

158. After the FDA in 2012 required all opioid manufacturers to adopt a strategy to combat opioid abuse, Teva began developing a new branded opioid called Vantrela. In seeking FDA approval of the drug, Teva presented Vantrela as an "abuse-deterrent" form of hydrocodone. Teva then developed a marketing plan to target managed care organizations in the hopes they

[31] Ex. 29 to Condodina Dep. (Sept. 12, 2008 letter from the FDA).
[32] *Id.*

would add this new drug to their formulary. The opioids that Teva sold were the generic versions of these same opioids. In fact, Teva sold millions of those same opioids in Tennessee from, and as part of its pitch, Teva cited to publicly available documents that demonstrated that the U.S. was in the midst of an opioid abuse and addiction crisis.

159. In 2015 and 2016, Teva was reviewing and sharing publicly available information and studies about opioid addiction in preparation for Teva's third-party payer marketing strategy for Vantrela, planning to promote Vantrela as an abuse deterrent product. One such publicly available source was a Time Magazine article in June 2015, highlighting the public health crisis of opioid addiction, including specifically in Tennessee. The Time story highlighted, among other things, that patients often buy the pills on the black market after becoming addicted, and approximately 1/5 of Americans who take opioids are estimated by the National Institutes of Health to be in danger of turning to the black market for more pills.

160. In June 2016 Actavis prepared a managed care overview to be provided to payers outlining why the misuse, abuse and diversion of opioids is a major public health concern, including the fact that in 2010 1 in 20 Americans over 12 abused opioids, in 2011 1 in 3 ER visits were opioid related, and in 2014 there were 18,000 opioid overdose deaths, a 300% increase in deaths from 1999. Teva recognized that between 9-28% of misusers of pain relievers get their drugs through a doctor's prescription. Teva also recognized the substantial economic burden of opioid abuse on healthcare, workplace, criminal justice, and societal costs. Teva even cited studies showing that approximately 27% of chronic pain patients prescribed opioids for non-cancer pain are likely to abuse the drugs. Teva positioned its branded Vantrela as a cost savings for managed care payers compared to its generic opioids because generic opioids have a "high rate of abuse and

generate enormous costs," lead to high levels of addiction, are responsible for around 2/3 of overdose deaths, contribute to increased healthcare costs and other indirect costs.

161. Despite now having clear knowledge of the risks of abuse of opioids, including its own opioid products, Teva continued to send its generic opioid products into Tennessee and throughout the United States in large numbers. Vantrela was approved by the FDA in January 2017, yet Teva continues to promote its generic, less abuse-deterrent drugs.[33] From 2015-2017, IMS data shows that over 2 million Teva produced opioids prescriptions were filled in Tennessee.

162. Like the other Drug Producer Defendants, Teva received chargeback data from its distributors that told Teva precisely where its pills were going, in what amount, and to whom. It had the ability to deny chargebacks relative to pharmacies and dispensing physicians supplied by its distributors, which effectively amounted to controlling whether its pills would reach those pharmacies or not.

163. Upon information and belief:

a. Teva recognized when orders were suspicious (because of the size of the order, the size of the community served, and other indicators) and likely to be diverted.

b. However, Teva rarely, if ever, denied chargebacks relative to pharmacies anywhere in the country, let alone in Tennessee.

c. Instead, Teva chose to fill those suspicious orders anyway, recognizing that the shipments were likely being dispensed to fill pill mill prescriptions or otherwise to be diverted into the black market.

164. Upon information and belief:

a. Teva recognized that prescription rates per capita are an indicator of potential abuse of prescription opioids.

---

[33] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2017/207975Orig1s000Approv.pdf

b. Nevertheless, Teva continued to fill orders in Tennessee where the per capita prescription rates were high and Teva knew or should have known had no legitimate medical need for the opioids being sold there.

c. In violation of Tennessee law, Teva failed to design and operate a system to monitor suspicious orders of controlled substances, and otherwise failed its obligation under Tennessee law to maintain effective controls against diversion.

d. Teva continued to supply far more opioids than were justified by a legitimate medical need in the Tennessee market.

e. Teva shipped orders that it knew or should have known were suspicious.

f. Teva did not report orders that it knew or should have known were suspicious.

g. Teva shipped orders despite the orders being suspicious.

165. Upon information and belief, Teva placed primary responsibility for detecting and reporting suspicious orders with its sales personnel. Those sales personnel were financially incentivized to call on customers who made suspicious prescriptions or submitted suspicious orders rather than report them, and to come up with sham justifications to "clear" suspicious orders or to justify calling on them further.

166. From 2002 to 2011, Teva did not report a single one of its prescription orders as suspicious.

167. In fact, prior to being named in numerous opioid-related lawsuits, Teva's SOM system has only flagged – and Teva only reported to the DEA – 6 TOTAL suspicious orders for the entire country.

168. This included just one reported suspicious order in 2013, one in 2014, four in 2015, and none in 2016.

169. Otherwise, Teva supplied essentially anyone and everyone who submitted an order for its drugs.

170. This included filling orders that it recognized were being dispensed, in large volumes, to fill prescriptions relative to prescribers under circumstances that Teva recognized were suspicious and indicative of diversion.

171. Teva shipped orders of opioids in frequencies and in volumes that were inherently suspicious. For example, in April 2015 alone, Teva shipped nearly 5 million pills of hydrocodone into Tennessee, through AmerisourceBergen and others. The multitude of orders comprising this volume necessarily were suspicious. Yet Teva filled them.

172. Upon information and belief, Teva filled similarly large volumes of orders from all of the Distributor Defendants for pharmacies and dispensing physicians within Tennessee, under circumstances demonstrating that each order was suspicious. Other than its so-called suspicious order monitoring program, Teva did nothing to prevent the illegal diversion of its prescription opioid products once the products leave the individual manufacturing facilities, even though it knew that some customers of prescription opioids obtain them expressly for nonmedical purposes. Teva was also aware that the opioid drug diversion problem was particularly large and problematic in Tennessee.

173. Upon information and belief:

a. Teva's suspicious order monitoring program was structured to be ineffective.

b. Teva, like the other Producer Defendants, utilized a sales force to sell its branded opioids who called on prescribers directly and on pharmacies and dispensing physicians – nationwide and in Tennessee.

c. Teva, like the other Producer Defendants, paid sales representatives of its branded opioids bonuses or commissions based on sales volume relative to Tennessee (as elsewhere).

d. Relative to branded sales, Teva financially incentivized its sales force to call on high-volume prescribers and targeted those high-volume prescribers to prescribe more opioids.

e. Relative to its relationship with pharmacies and dispensing physicians, Teva financially incentivized its sales personnel to process and fill suspicious orders.

174. Upon information and belief, Teva knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were engaged in suspicious activity ; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

## C. The Distributor Defendants Participated in the Illegal Drug Market

### 1. The Distributor Defendants Facilitated Diversion

175. The Distributor Defendants facilitated illegal drug transactions in Tennessee by submitting suspicious orders, having them filled, and stocking suspect independent and retail chain pharmacies and dispensing physicians with opioids destined for the illegal drug market.

176. The Distributor Defendants had a choice when faced with suspicious orders: submit them or impound them and investigate until they actually cleared the suspicion.

177. ABC and Cardinal account for a vast majority of the market nationwide, and an equivalent amount in Tennessee.

178. They know that they have an important responsibility to monitor their customers' practices and that they are not supposed to fill suspicious orders.

179. The Distributor Defendants knew they should monitor, detect, and halt suspicious orders. For example, industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."[34] The guidelines set forth recommended steps in the "due diligence" process, and note in particular "[i]f an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest."[35]

180. The Distributor Defendants sold prescription opioids in and around the Baby Doe Plaintiffs' community, which Defendants knew or should have known were likely to be diverted into the illegal drug market.

181. DEA Agent Joseph Rannazzisi has emphasized the importance of the Distributor Defendants in preventing opioid diversion: "[b]ecause distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances . . . from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled

[34] Healthcare Distribution Management Association (HDMA) Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances (filed in *Cardinal Health, Inc. v. Holder*, No. 12-5061, Doc. No. 1362415 (App'x B) (D.C. Cir. Mar. 7, 2012).
[35] *Id.*

substances. Should a distributor deviate from these checks and balances, the closed system created by the [Controlled Substances Act] collapses."[36]

182. The sheer volume of prescription opioids distributed to pharmacies in the Baby Doe Plaintiffs' community is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

183. The Distributor Defendants filled inherently suspicious orders originating from the Baby Doe Plaintiffs' community which the Distributor Defendants knew or should have known were likely to be diverted to or within the Baby Doe Plaintiffs' community.

184. Upon information and belief, the Distributor Defendants filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, orders of unusual frequency in the Baby Doe Plaintiffs' community, and orders which Defendants knew or should have known were likely to be diverted into the Baby Doe Plaintiffs' community.

185. Distributor Defendants possessed direct knowledge of obvious signs of diversion by their customers. They knew that Tennessee pharmacies were receiving prescription opioids in volumes grossly disproportionate to the population and any conceivable medical need. They knew that local prescribers near those pharmacies were prescribing at levels that were not medically justifiable and that the pharmacies were filling prescriptions for suspect prescribers.

186. Upon information and belief, rather than seek to stop pharmacies from supplying pills or to stop dispensing physicians who were operating pill mills, the Distributor Defendants targeted these entities and competed for their business. In other words, the Distributor Defendants

---

[36] Declaration of Joseph Rannazzisi, ¶ 10 (filed in *Cardinal Health, Inc. v. Holder*, No. 1:12-cv-00185-RBW, Doc. 14-2 (D.D.C. February 10, 2012).

targeted high-volume dispensing pharmacies (including independent or locally owned pharmacies) to compete for their business.

187. The Distributor Defendants have been subject to repeated investigations and citations for streaming prescription opioids into the illegal drug market.

188. For example, on September 27, 2006, the DEA sent a letter to "every commercial entity in the United States registered with the [DEA] to distribute controlled substances."[37] The letter stated that manufacturers and distributors "share responsibility for maintaining appropriate safeguards against diversion" and "given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, ***even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm***."[38] The letter advised that "DEA will use its authority to revoke and suspend registrations in appropriate cases."[39] The letter also provides that "in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."[40] The letter further discusses that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."[41]

---

[37] 2006 Rannazzisi Letter at 1.
[38] *Id.* at 2 (emphasis added).
[39] *Id.*
[40] *Id.*
[41] *Id.* at 1.

189. The DEA sent another letter on December 27, 2007 to "reiterate the responsibilities of controlled substance manufacturers and distributors to inform DEA of suspicious orders." [42] This letter reminded manufacturers and distributors of their obligation to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."[43]

190. The letter states that in terms of reporting suspicious orders:

> Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.
>
> When reporting an order as suspicious, registrants must be clear in their communications with DEA that the registrant is actually characterizing an order as suspicious. Daily, weekly, or monthly reports submitted by a registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."[44]

The 2007 letter also said that "[f]ailure to maintain effective controls against diversion is inconsistent with the public interest . . . and may result in the revocation of the registrant's DEA Certificate of Registration."[45]

191. The 2007 letter also references the final order issued in Southwood Pharmaceuticals, Inc., 72 FR 36487 (2007), which "[i]n addition to discussing the obligation to

---

[42] 2007 Rannazzisi Letter at 1.
[43] *Id.*
[44] *Id.* at 2.
[45] *Id.* at 1-2.

report suspicious orders when discovered" and "some criteria to use when determining whether an order is suspicious," the order "also specifically discusses your obligation to maintain effective controls against the diversion of controlled substances."[46]

192. The Distributor Defendants knew which pharmacies and dispensing physicians were filling prescriptions, including the amount and type of drug. The Distributor Defendants maintained direct relationships with pharmacies and dispensing physicians, including those plainly engaging in filling pill mill prescriptions *en masse*.

193. The illegal market for prescription opioids exists because distributors choose to submit suspicious orders to manufacturers, manufacturers choose to fill them, and the distributors distribute them to suspect pharmacies where they fill prescriptions written by pill mill doctors. In American Overdose, Mr. Rannazzisi summed up the role of distributors: To Rannazzisi, distributing highly addictive and potentially lethal drugs wasn't the same as delivering chocolate bars. He regarded the lucrative licenses the wholesalers held as carrying particular responsibilities: "These companies have one task, and that is the safe and secure distribution of drugs, particularly prescription drugs. Otherwise FedEx or UPS could do this role. This isn't a compliance challenge, like gender discrimination at a tech company, which is horrific, but it's not fundamental to their operation. This is the equivalent of a tech company failing on cybersecurity. If these companies were doing their job right, you shouldn't be seeing black-market prescription painkillers."

### 2. <u>AmerisourceBergen Has a History of Facilitating Illegal Drug Transactions</u>

194. On April 24, 2007, the DEA issued an immediate suspension order ("ISO") on AmerisourceBergen's Orlando, Florida distribution center, alleging that AmerisourceBergen was

[46] *Id.* at 2.

not controlling shipments of prescription opioids to Internet pharmacies and revoking the facility's license to distribute controlled substances.[47]

195. On June 22, 2007, AmerisourceBergen entered into a settlement with the DEA which led to the reinstatement of the Orlando distribution center's suspended license.[48] Under that agreement, AmerisourceBergen was required to implement an enhanced order-monitoring program in all of its distribution centers by June 30, 2007.[49]

196. In 2012, West Virginia's then-Attorney General Darrell McGraw filed lawsuits against AmerisourceBergen, Cardinal Health, and a dozen smaller drug distributors for their role in a drug supply chain that includes doctors who write prescriptions for nonmedical purposes and "pill mill" pharmacies that dispense excessive numbers of painkillers, including opioids.[50] In February 2017, Cardinal Health and AmerisourceBergen agreed to pay $20 million and $16 million, respectively, to resolve West Virginia's claims.[51]

197. The settlement, which is believed to be the largest pharmaceutical settlement in West Virginia history, came shortly after a Charleston Gazette-Mail investigation revealed that drug wholesalers shipped 780 million hydrocodone and oxycodone pills to West Virginia in just six years – a period when 1,728 West Virginians fatally overdosed on those two drugs.[52] AmerisourceBergen alone shipped 80.3 million hydrocodone pills and 38.4 million oxycodone

[47] 2007 AmerisourceBergen Corporation Form-10K. Available at: https://www.sec.gov/Archives/edgar/data/1140859/000119312507255013/d10k.htm.
[48] *Id.*
[49] *Id.*
[50] Eric Eyre, 2 drug distributors to pay $36M to settle WV painkiller lawsuits, Charleston Gazette-Mail, January 9, 2017. Available at: http://www.wvgazettemail.com/news-cops-and-courts/20170109/2-drug-distributors-to-pay-36m-to-settle-wv-painkiller-lawsuits.
[51] *Id.*
[52] *Id.*

pills from 2007 to 2012. And Cardinal Health and AmerisourceBergen combined to ship nearly 40 percent of all hydrocodone and oxycodone pills to West Virginia.[53]

198. According to unsealed court documents from the West Virginia case, AmerisourceBergen distributed 149,300 hydrocodone pills – or 12,400 pills a month – to Tug Valley Pharmacy in Mingo County in 2009.[54] The pharmacy filled prescriptions for Drs. Diane Shafer, Katherine Hoover and William Rykman, who operated "sham" pain clinics in Williamson.[55] Federal agents raided the clinics in 2010 and they never reopened.[56]

199. Unsealed court documents from that case further evidence that AmerisourceBergen shipped 8,000 hydrocodone painkiller tablets to a drive-thru pharmacy over two days in July 2012.[57] On those same two days, a competing drug wholesaler shipped 8,600 hydrocodone tablets to the same "pill mill" pharmacy.[58] AmerisourceBergen sold another 3,800 oxycodone pills to the same pharmacy that month.[59]

200. AmerisourceBergen also sent 16 billion pills to Missouri in a five-year period, during which time it reported only ***244 suspicious orders nationwide***.[60]

---

[53] *Id.*
[54] Eric Eyre, *18 'words' reveal drug giant's pain pill shipments to WV*, Charleston Gazette-Mail, May 25, 2016. Available at: http://www.wvgazettemail.com/news/20160525/18-words-reveal-drug-giants-pain-pill-shipments-to-wv.
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] https://www.npr.org/sections/health-shots/2018/07/12/628191409/report-1-6-billion-opioid-doses-poured-into-missouri-over-6-years.

201. In 2017, AmerisourceBergen plead guilty to illegally distributing misbranded drugs and agreed to pay $260 million to resolve criminal liability for its distribution of drugs from a facility that was not registered with the FDA.

202. In 2018, AmerisourceBergen entered into a Corporate Integrity Agreement ("CIA") with the U.S. Dept. of Health & Human Services, and agreed to pay $625 million to resolve civil fraud charges.

203. AmerisourceBergen had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Upon information and belief, AmerisourceBergen premised utilized sales of prescription opioids as a basis for sales representative compensation at least through 2012.

204. Upon information and belief, AmerisourceBergen continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

205. AmerisourceBergen failed to report suspicious orders, shipped opioids even after flagging an order as suspicious, and did not maintain effective controls against diversion.

206. Upon information and belief, AmerisourceBergen has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (*i.e.*, that was designed to be ineffective), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

207. AmerisourceBergen maintained an internal list of suspect prescribers, but it chose not to share that information with the pharmacies it supplied.

208. AmerisourceBergen also placed certain customers on a "do not ship" list, but (upon information and belief) continued to ship opioids to them.

209. AmerisourceBergen recognized that many of its customers in Tennessee were supplying the illegal drug market, filling prescriptions for pill mills, and otherwise filling prescriptions far beyond any legitimate medical need.

210. Upon information and belief, it also filled orders originating in Tennessee and Baby Doe Plaintiffs' community of unusual size or frequency, or that the Distributor Defendants otherwise recognized were indicative of diversion.

211. Upon information and belief, AmerisourceBergen was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

212. AmerisourceBergen also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

213. Also, upon information and belief, AmerisourceBergen knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

### 3. <u>Cardinal Health Has a History of Facilitating Illegal Drug Transactions</u>

214. On September 27, 2006, the DEA sent a letter to Cardinal reminding Cardinal that it was the distributors' responsibility to ensure that their products were not diverted for illicit use. The letter reminded Cardinal that it could not "simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances." Cardinal and, upon information and belief, all the other defendants in this action nevertheless used that an entity was registered as a basis to submit and fill plainly suspicious orders.

215. Based on findings from DEA investigations, in November and December 2007, the DEA issued three Immediate Suspension Orders ("ISOs") to Cardinal Health.

216. On November 28, 2007, the DEA issued an ISO to Cardinal Health in connection with its distribution center in Auburn, Washington (the "Auburn Facility"), immediately suspending the facility's Certificate of Registration because its continued registration constituted "an imminent danger to public health and safety."[61]

217. According to the ISO, the Auburn Facility repeatedly "distributed unusually large amounts of hydrocodone" to Horen's Drugstore, Inc. ("Horen's Drugstore") – distributing 600,000 dosage units of hydrocodone to Horen's Drugstore from March 2007 through September 2007 – and "disregard[ed] the clear indications that Horen's Drugstore was engaged in the diversion of controlled substances[.]" Horen's Drugstore was Cardinal Health's largest purchaser of combination hydrocodone products in 2007, and according to the ISO, the drugstore was "a pharmacy engaged in a scheme to dispense controlled substances based on prescriptions that are

---

[61] *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185, Dkt. 14-15 ("Settlement and Release Agreement and Administrative Memorandum of Agreement"), ¶ 2, Appendix B (D.D.C. 2012). (Hereinafter "2008 Cardinal Health MOA").

issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice. This pharmacy dispensed excessive amounts of hydrocodone based on illegitimate prescriptions originating from rogue Internet pharmacy websites, in violation of applicable Federal and State law." The DEA found that Cardinal Health "failed to maintain effective controls against diversion of a particular controlled substance into other than legitimate medical, scientific and industrial channels," and concluded that its continued registration with the DEA constituted "an imminent danger to the public health and safety."

218. On December 5, 2007, the DEA issued an ISO notifying Cardinal Health of the immediate suspension of its Lakeland, Florida drug distribution facility for failure to maintain effective controls against diversion of hydrocodone.[62]

219. The ISO detailed how, from August 2005 through October 2007, Cardinal Health failed to maintain effective controls against the diversion of hydrocodone into other than legitimate medical, scientific and industrial channels. According to the ISO, Cardinal Health distributed hydrocodone to various pharmacies, even though the company knew that many of the orders placed by the pharmacies were of an unusual size and were "suspicious" as defined in the CSA. For example, Cardinal Health distributed 1,213,000 dosage units of hydrocodone to Q-R-G, Inc. over the course of February to June 2006, and approximately 1,148,100 dosage units to United Prescription Services, Inc. from July to October 2006. The ISO further detailed that, on September 1, 2006, Eric Brantley, Manager of Quality and Regulatory Affairs for Cardinal Health, sent an email to the DEA stating that Cardinal Health discontinued all sales of controlled substances to 13 Internet pharmacies, including RKR Holdings, Inc. Nevertheless, from

[62] *Id.* at ¶ 3, App'x C.

September 1, 2006 to January 31, 2007, Cardinal Health distributed 393,600 dosage units of hydrocodone products to RKR Holdings. As explained therein Cardinal distributed over 8,000,000 dosage units of hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific, and industrial channels.[63] Indeed, the ISO indicated that many of Cardinal's largest purchasers "were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that are issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

220. On December 7, 2007, the DEA issued an ISO to Cardinal Health regarding its distribution center in Swedesboro, New Jersey which, from January 2005 to August 2007, "distributed over 4.5 million dosage units of combination hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific and industrial channels."[64]

221. The ISO stated that some of Cardinal Health's "largest purchasers of combination hydrocodone products were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that were issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

222. In addition to the November and December 2007 ISOs, on January 30, 2008, the DEA issued an Order to Show Cause as to why the agency should not revoke the Certificate of Registration assigned to Cardinal Health's Stafford, Texas distribution center for the improper

[63] *Id.* at ¶ 2.
[64] *Id.* at ¶ 4, App'x D.

distribution of hydrocodone.[65] The DEA also found that Cardinal Health failed to maintain effective controls against the diversion of controlled substances at its McDonough, Georgia facility, Valencia, California facility, and Denver, Colorado facility. In total, the DEA had reason to believe that seven of Cardinal Health's twenty-seven then-registered distribution centers were not adhering to their obligations under the CSA.

223. On December 27, 2007, the DEA sent another letter to Cardinal reminding it that all distributors had an obligation to maintain effective controls against diversion.[66]

224. Following the three 2007 ISOs and the Order to Show Cause, the DEA and Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement ("MOA") on September 29, 2008.[67] Pursuant to the MOA, Cardinal Health agreed to pay a civil fine of $34 million, and "maintain a compliance program designed to protect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations."[68]

225. Cardinal's 2008 settlement and MOA with the DOJ lists Cardinal facilities in La Vergne, Tennessee and Knoxville, Tennessee as having failed to maintain effective controls against diversion.

226. After entry of the 2008 MOA, Cardinal Health began violating the CSA again almost immediately. A further investigation of Cardinal Health's Lakeland, Florida facility by the DEA "revealed a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted" over a period of approximately 3 years, from November 2008 to

---

[65] *Id.* at ¶ 5, App'x E.
[66] *Cardinal Health, Inc. v. Holder*, Decl. of J. Rannazzisi, doc no. 14-2 at 12.
[67] *Id.*
[68] *Id.*

December 2011.[69] The lack of anti-diversion controls resulted in the top four customers of Cardinal Health's Lakeland facility being supplied with approximately 50 times the amount of oxycodone compared to the average Florida retailer that Cardinal Health services, which the DEA referred to as a "staggering" difference in distribution.[70] Of those four pharmacies, one was found to be "dispensing oxycodone 30mg prescriptions . . . for persons whose addresses were in Kentucky and Tennessee and who paid cash."[71]

227. The DEA's further investigation culminated in the issuance of another ISO regarding the Lakeland, Florida facility on February 2, 2012 (the "2012 ISO") for failure to maintain effective controls against diversion of oxycodone.[72]

228. The 2012 ISO stated that, "[d]espite the MOA, the specific guidance to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of [the CSA]."[73] According to the ISO:

> From January 1, 2008 through December 31, 2011 . . . Cardinal's sales of oxycodone products to its top four retail pharmacy customers exceeded 12.9 million dosage units. . . . From 2008 to 2009, Cardinal's sales to its top four retail pharmacy customers increased approximately 803%. From 2009 to 2010, Cardinal's sales to its top four retail pharmacy customers increased approximately 162%. [¶] The egregious quantities of oxycodone distributed by Cardinal to its top four retail pharmacy customers well exceeded the amount of oxycodone distributed to Cardinal's Florida retail pharmacies, which receive, on average, approximately 5,347 dosage units of oxycodone per month.[74]

---

[69] *Id.* at ¶ 75.
[70] *Id.* at ¶ 76.
[71] Holidays CVS, LLC d/b/a CVS Pharmacy Nos. 219 and 5195 Decision and Order, 77 Fed. Reg. 62316, 62318 (Oct. 12, 2012).
[72] *Cardinal Health, Inc. v. Holder*, Case No. 1:12-cv-00185, Dkt. 14-18 (D.D.C. 2012).
[73] *Id.* at ¶ 3.
[74] *Id.* at ¶ 4.

229. The 2012 ISO further provided that "[n]otwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers."[75]

230. In May 2012, following a DEA investigation, Cardinal Health entered into a second memorandum of agreement relative to its 28 registered distribution facilities. The MOA required Cardinal to maintain a compliance program to monitor and detect diversion, to implement a system for conducting an in-person investigation for any suspicious orders."

231. On December 23, 2016, Cardinal Health agreed to pay a $34 million fine (separate from the $34 million fine in 2008) to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center.[76]

232. Also on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida, and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA. In the settlement, Cardinal Health admitted, accepted, and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to "timely identify suspicious orders of controlled substances and inform the DEA of those orders" or to

---

[75] *Id.* at ¶ 5.

[76] Press Release, United States Reaches $34 Million Settlement With Cardinal Health For Civil Penalties Under The Controlled Substances Act, DOJ, U.S. Attorney's Office – Middle District of Florida. Available at: https://www.justice.gov/usao-mdfl/pr/united-states-reaches-34-million-settlement-cardinal-health-civil-penalties-under.

"maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."

233. Upon information and belief, Cardinal Health had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Cardinal Health utilized sales of prescription opioids as a basis for sales representative compensation at least through 2012.

234. Upon information and belief, Cardinal Health continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

235. Upon information and belief, Cardinal Health has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (*i.e.*, that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

236. Cardinal also chose not to report (*i.e.*, to conceal) customers who it identified in an initial onboarding process as having signs of diversion.

237. Also, where a manufacturer removed a Cardinal customer from its chargeback list, Cardinal understood that this was because the customer was suspected of diversion. However, where a manufacturer reinstated a customer to the chargeback list, Cardinal would resume distributing opioids to those customers anyway.

238. Cardinal also engaged in other practices that facilitated diversion of its productions, including

a. Terminating a customer from one distribution center but not the other (*i.e.*, even where a customer was flagged for diversion and cut off from one Cardinal distribution center, Cardinal did not cut the customer from other Cardinal centers).

b. Where a customer hit Cardinal's "threshold" for suspicious activity on one type of opioid, Cardinal might terminate the customer only as to that specific opioid but nevertheless continue to ship other below-threshold opioids to that customer (rather than stop shipments entirely until the suspicion was investigated and dispelled).

c. Cardinal permitted sales representatives to request SOM threshold increases to permit Cardinal to keep shipping opioids to a customer even though Cardinal's own self-imposed metrics had flagged it.

d. Cardinal chose not to examine whether pharmacy retail chains had any anti-diversion programs in place and chose not to audit the compliance efforts of national alternate care accounts or national mail order accounts.

239. Upon information and belief, Cardinal was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

240. Cardinal also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

241. Upon information and belief, Cardinal also knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate

prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## D. The Pharmacy Chain Defendants' Self-Distribution of Opioids Facilitated the Illegal Opioid Market in Tennessee

242. The Pharmacy Chain Defendants, in addition to purchasing opioid medications from the Distributor Defendants, also self-distributed opioid medications to their pharmacy locations.

243. The Pharmacy Chain Defendants had the same obligations under Tennessee law to monitor, detect, and halt suspicious orders as the Distributor Defendants.

244. Similarly, upon information and belief, the Pharmacy Chain Defendants failed to identify, investigate, report, and/or halt suspicious opioid orders across the country, including orders going to Tennessee, and otherwise failed to maintain effective controls against diversion for shipments into and within Tennessee.

245. The numbers that each Pharmacy Chain Defendant distributed into the State of Tennessee were staggering. From just 2006 to 2014:

a. Walgreens distributed 642,704,930 dosage units of opioids into Tennessee;

b. CVS distributed 186,897,900 dosage units into Tennessee; Rite Aid distributed 82,412,650 dosage units into Tennessee; and

c. Walmart distributed 251,048,435 dosage units into Tennessee.

246. Upon information and belief, the Pharmacy Chain Defendants did not implement effective diversion control measures when shipping these pills. Instead, they put in place policies and protocols that ensured that the flow of drugs into the illegal market would continue.

### 1. <u>CVS Knowingly Fueled the Illegal Opioid Market</u>

247. Before 2009, CVS had no suspicious order monitoring system at all. Instead, it relied on individual "Pickers and Packers" to identify orders of unusual size, frequency, or pattern without clear criteria. CVS had no written policies, procedures, or protocols for the Pickers and Packers, no formal qualifications for the position, and no training.

248. In 2009, CVS at least began using a computer algorithm to flag suspicious orders, but that algorithm was flawed from the outset. The SOM did not function properly because it monitored by drug rather than active ingredient, such that changes in a drug's description or name caused the historical data (necessary for valid calculations) to be lost. The system also failed to account for orders made by and shipped to CVS pharmacies from third parties. Thus, as CVS itself admitted, a particular store could defeat the computer threshold simply by purchasing excess of the threshold from someone other than CVS. CVS knew that this resulted in filling suspicious orders from its pharmacies. At least as of July 2013, CVS internally had identified that CVS's supposed SOM process was irrelevant and pointless. CVS did not implement a SOM system until mid to late 2014, at which point its distribution centers stopped distributing Schedule II opioids at the whole level.

249. CVS did not conduct appropriate due diligence on flagged orders. It did not conduct meaningful diligence on more than a small fraction of flagged orders. In 2012 and 2013, CVS at times had only one employee reviewing all potentially suspicious orders for every CVS pharmacy

in the country. In other words, CVS designed this program to fail, knowing that it would allow for suspicious orders to be filled unabated.

250. Upon information and belief, CVS has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs.

251. Upon information and belief, CVS never reported a single suspicious order to the Tennessee Board of Pharmacy.

252. Upon information and belief, CVS has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (*i.e.*, that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

253. Upon information and belief, CVS was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and CVS knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

254. CVS also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

255. Also, upon information and belief, CVS knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales

representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

### 2. Walgreens Knowingly Fueled the Illegal Opioid Market

256. Nationally, from 2006 to 2012, according to a Washington Post analysis, "Walgreens dominated the nation's retail opioids market."[77] During that period, Walgreens acted as its own wholesaler, obtaining 97 percent of pain pills directly from drug manufacturers, which allowed it to have more control over how many pain pills it sent to its stores.[78] Edward Bratton, Walgreens' manager of pharmaceutical integrity, described the company's SOM system prior to 2013 as a "system [that] would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone[.]"[79]

257. For example, Walgreens used rigid formulas to "detect" suspicious orders. The formulas simply utilized an average number based on historical orders, applied a three times multiplier on that base number, and then flagged an order if it exceeded that multiplier. From 2007 forward, an order would have been flagged only if it exceeded that multiplier for two consecutive months. The formulas were not scaled to the size of the community served. Nor were they informed by geography, population, news reports, local information (provided by pharmacists or news reports), outside investigation, or any form of human input that would actually be effective

[77] Jenn Abelson, Aaron Williams, Andrew Ba Tran, & Meryl Kornfield, *At Height of Crisis, Walgreens Handled Nearly One in Five of the Most Addictive Opioids*, Wash. Post, Nov. 7, 2019, https://www.washingtonpost.com/investigations/2019/11/07/height-crisis-walgreens-handled-nearly-one-five-most-addictive-opioids/.

[78] *Id.*

[79] *Id.*

at slowing the flow of opioids into the illegal drug market in Tennessee. Instead, by setting these thresholds artificially high, Walgreens ensured that it would keep shipping orders below the threshold even though it should have halted those orders (rather than fill them).

258. Even at the exceedingly high threshold it had set, Walgreens still identified thousands of orders each week that hit that threshold. Those orders were obviously suspicious. Yet rather than halt the orders, ***Walgreens elected to ship them***. By shipping orders that Walgreens itself had identified as suspicious, it committed an act intended to facilitate the distribution of drugs into the illegal market.

259. Walgreens then waited until ***after*** shipping the orders to report them to anyone. By waiting until after filling an order to report it, Walgreens was able to facilitate the flow of drugs into Tennessee's illegal market.

260. In September 2012, the DEA issued an immediate suspension order ("ISO") for Walgreens' Schedule II distribution facility in Jupiter, Florida.[80] In the ISO, the DEA found that Walgreens' distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest." The ISO made the following findings:

a. In violation of its duty report under 21 CFR 1301.74 and a 2007 letter from the DEA, Walgreens had not reported suspicious orders as they were discovered, but instead had shipped the orders without due diligence to determine if the order was actually being made to serve legitimate medical needs;

b. Even though the facility served 12 states and Puerto Rico, the formula was the same regardless of a pharmacy's location, the population it serves, or the number of other pharmacies in the area;

[80] https://www.dea.gov/press-releases/2012/09/14/dea-serves-suspension-order-walgreens-distribution-center-jupiter-florida.

c. Walgreens had failed to maintain an adequate suspicious order reporting system, ignored readily identifiable orders and ordering patterns that obviously reflected diversion at Walgreens pharmacies; and

d. Walgreens had distributed large amounts of opioids to pharmacies that it knew or should have known were dispensing the drugs to fill prescriptions that were not intended to serve a legitimate medical purpose.

261. Despite these and other warnings, Walgreens continued to commit acts intended to facilitate the distribution and dispensing of drugs by its pharmacies into the illegal market. It has admitted that it is unaware of ever performing a due diligence review ***before*** shipment on orders listed on its Suspicious Drug Control Order report.

262. At the distribution center level, Walgreens purposely designed its system simply to supply whatever quantities of drugs its pharmacies requested, rather than to identify red flags of potential diversion.

263. Moreover, when Walgreens purported to implement anti-diversion measure in 2010 (for the first time), it designed the program to have significant holes. For years, the program did not include orders that Walgreens stores were also placing to outside vendors, like Cardinal and AmerisourceBergen, allowing stores to order opioids from Walgreens distribution centers and from Cardinal and AmerisourceBergen, effectively permitting double dipping. Walgreens stores also could transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, allowing transfer for which Walgreens' SOM system did not account. Stores could also place ad hoc "PDQ" (short for "pretty darn quick") orders for controlled substances outside of their normal orders days and outside of the SOM analysis and limits. Walgreens even could remove a store entirely from its SOM review.

264. Furthermore, at times when a store would submit an order that exceeded Walgreens' exceedingly high threshold, Walgreens would reduce the order to the threshold and

ship it without conducting further investigation into why its pharmacies were making suspicious orders.

265. Walgreens also intentionally understaffed the department that was supposed to conduct diligence and intentionally did not give that group proper training. Despite thousands of orders being flagged each week (even under Walgreens' improperly high threshold), Walgreens officials reviewed only a small fraction. It therefore continued to ship even those orders that it had identified as suspicious.

266. In November 2012, Walgreens simply began reducing orders down to threshold rather than halting the orders, investigating them, and reporting them to an appropriate official.

267. According to Walgreens witnesses, the company did not confirm a single suspicious order that it shipped to its stores.[81]

268. Walgreens has been repeatedly cited and penalized for shipping without effective controls against diversion. For example, in April 2013, it agreed to a then-record $80 million settlement with the DEA to resolve allegations that it had shipped oxycodone and other prescription painkillers that were diverted into the black market. The agreement mandated that, at a corporate level, Walgreens had to maintain a "Department of Pharmaceutical Integrity, a Suspicious Order Monitoring system, remove controlled substance from the calculation of bonuses for pharmacists and technicians, and verify prescribers' DEA numbers to ensure their validity.

269. Upon information and belief, despite these warnings, Walgreens continued to violate its responsibilities as a Tennessee registrant.

[81] Bratton 65:20-66:11.

270. In particular, Walgreens' conduct facilitated the illegal distribution of opioids into the black market in Tennessee.

271. Even when pharmacies did hit internal limits imposed by Walgreens, "they could still transfer pills from other stores or order from outside suppliers[,]"[82] Walgreens officials intentionally authorized pharmacies to exceed the internal limits to maintain sales volume.

272. "Pharmacies could also find workarounds by placing special PDQ orders, meaning 'pretty darn quick,' from Walgreens internal network[,]"[83] a technique used repeatedly by Walgreens pharmacies in Tennessee. In 2012, Walgreens suggested forbidding PDQ orders for oxycodone products.[84] Pharmacy executive Kermit Crawford vehemently objected to the proposed change, writing, "I was not under the impression this was a done deal. Concerned we are 'all or none.' We have to do what's right for patients also."[85]

273. Upon information and belief, Walgreens has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (*i.e.*, that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

274. Upon information and belief, Walgreens was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or

---

[82] Abelson, et al., supra note ___.
[83] Abelson, et al., supra note ___.
[84] Abelson, et al., supra note ___.
[85] Abelson, et al., supra note 192.

should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

275. Walgreens also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

276. Also, upon information and belief, Walgreens knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community.

### 3. <u>Walmart Knowingly Fueled the Illegal Opioid Market</u>

277. From 2000 to approximately May 2018, Walmart self-distributed tens of millions of shipments of controlled substances to Walmart-branded and Sam's Club-branded pharmacies. Throughout the period from 2012 to 2018, Walmart was the largest self-distributor in the country for oxycodone, hydromorphone, and hydrocodone in terms of both dosage units and grams.

278. Because Walmart acted as its own distributor, it had access to extensive data and other information that independent distributors would not ordinarily have. In particular, Walmart had a wealth of dispensing information that gave it the ability to investigate the circumstances underlying orders for controlled substances. Walmart had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

279. Despite having information about how often and how much Walmart-branded pharmacies and Sam's Club-branded pharmacies ordered from third-party distributors, Walmart did not account for these orders and shipments in its SOM program.

280. Before 2011, Walmart did not even have a SOM system in place.

281. In November 2010, Walmart adopted Pharmacy Manual 21-402 ("Controlled Substance Monitoring"). This policy simply required certain Walmart employees to review a monthly report, known as a "control drug stock exception report," after the controlled substances had been shipped to the pharmacies and identify any controlled substances that constituted more than 3.99% of a pharmacy's total controlled and non-controlled substance purchases during the prior month.

282. Under Pharmacy Manual 21-402 (November 2010), Walmart failed to detect many unusual orders. First, the monthly reports did not identify specific controlled substance orders that were unusually large. Instead, the reports aggregated all shipments of particular controlled substances and then compared those aggregated totals to see if they exceeded 3.99% of a pharmacy's total shipments that month. As a result, many unusually large orders were not flagged because they were not subsumed in the aggregated totals. Second, the policy did not require Walmart to flag any orders that were otherwise suspicious (e.g., exhibiting an unusual frequency or unusual pattern).

283. Pharmacy Manual 21-402 (November 2010) did not describe these aggregated totals as "suspicious orders" or even state that Walmart was required to detect and report suspicious orders to DEA.

284. In a June 12, 2014 email, Walmart attached a risk assessment in which it observed that its system for monitoring suspicious orders was an "existing risk" and "emerging risk" for

which it had "no processes in place." Walmart's own assessment was that the risk that its pharmacies would place suspicious orders with its own distribution centers was "likely," the second-highest of five levels on Walmart's scale of likelihood of risks.

285. In July 2014, Walmart revised Pharmacy Manual 21-402 and titled the revised policy "Evaluating Orders of Interest and Suspicious Order Reporting." Unlike the 2010 version of the policy, Pharmacy Manual 21-402 (July 2014) instructed compliance unit personnel to evaluate individual orders as they were placed—rather than monthly aggregated totals after Walmart's distribution centers had already shipped the controlled substances—and report any suspicious orders to DEA.

286. Pharmacy Manual 21-402 (July 2014) called for Walmart first to identify "orders of interest" from among all controlled substance orders, and then to investigate those "orders of interest" to determine whether they were indeed "suspicious orders" subject to reporting to DEA.

287. Both steps of this system failed. The criteria Walmart adopted for flagging "orders of interest in the first instance were plainly inadequate, allowing many suspicious orders to evade any scrutiny. And Walmart routinely failed to investigate orders that were flagged as "orders of interest" to ascertain whether they were suspicious, prioritizing expeditious distribution of controlled substances to meet its pharmacies' and pharmacists' demands over compliance with state and DEA regulations.

288. Walmart failed to detect and report at least hundreds of thousands of suspicious orders of controlled substances. Over an approximately four-year period from 2013 to 2018, a time during which Walmart shipped an estimated 37.5 million controlled-substance orders to its pharmacies, it reported only 204 suspicious orders to the DEA—in other words, almost none.

289. Upon information and belief, Walmart has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs. This included implementing a suspicious order monitoring system that did not actually detect, limit, or impound suspicious orders (*i.e.*, that was designed to fail), filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

290. Upon information and belief, Walmart was aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states, and knew or should have known that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids.

291. Walmart also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

292. Also, upon information and belief, Walmart knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community.

### E. The Pill Mill Defendants Have Illegally Trafficked Prescription Opioids in and Around the Baby Doe Plaintiffs' Community, Aided by the Producer Defendants, the Distributor Defendants, and the Pharmacy Chain Defendants

#### 1. Timothy Abbott Fueled the Illegal Drug Market by Unlawfully Prescribing Opioids and Operating a Pill Mill

293. Defendant Timothy Abbott was a podiatrist who practiced in Davidson County until he was indicted on criminal drug charges in April 2019.

294. Abbott was "an easy source of addictive and dangerous narcotics rather than a legitimate doctor." His clinic was "extremely dirty," containing only a single exam room with "old and rusty equipment." The Department of Justice described it as "a clinic where any given patient, on any given day, could expect to receive a prescription for opioids by just asking for one."[86]

295. According to court documents, Abbott would schedule multiple patients every 15 minutes each day, and wrote a prescription every 10 minutes, with 90 percent being oxycodone, and he did not conduct medical examinations or follow-ups nor did he discuss the risks of taking opioids.[87]

296. Indeed, Abbott's prescribing numbers back this description up: between 2016 and 2018, he was the highest-prescribing podiatrist in the state, writing 3,689 prescriptions for hydrocodone and oxycodone. On average, podiatrists wrote between 100 and 200 opioid prescriptions during the same time period, with the next-highest prescribing podiatrist writing 1,045 opioid prescriptions, over 2,500 less than Abbott.

297. On April 10, 2019, Abbott was indicted on 7 counts of unlawful distribution of opioids as a result of the Appalachian Regional Prescription Opioid Strike Force's investigation.

298. On February 26, 2020, Abbott pleaded guilty to all 7 counts, Abbott admitted that he "prescribed Schedule II controlled substances, including hydrocodone, for his patients outside the usual course of professional practice and without a legitimate medical purpose." Abbott further admitted that, from April 26, 2013, to February 25, 2019, he unlawfully prescribed hydrocodone on at least 44 separate occasions.

---

[86] *See* 1/22/20. Feds: Nashville podiatrist, accused of drug dealing, prescribed opioids to 'anyone who asks', *https://www.tennessean.com/story/news/health/2020/01/15/feds-nashville-podiatrist-tim-abbott-prescribed-opioids-anyone-who-asks/2835926001/*.

[87] https://fox17.com/amp/news/local/nashville-podiatrist-to-plea-guilty-to-federal-drug-charges.

299. On June 9, 2020, following his guilty plea, the Tennessee Board of Podiatric Medical Examiners revoked Abbott's license. As grounds for this revocation, the Board specifically cited: (a) that Abbott's opioid prescriptions were in amounts and/or for durations that were not medically necessary, advisable or justified; (b) Abbott had failed to perform proper diagnostic testing prior to prescribing opioids; (c) that Abbott failed to document his controlled substance prescriptions; and (d) that Abbott's opioid prescribing was in a non-therapeutic manner, was not justified, was not medically necessary, and was not for any legitimate purposes.

300. Abbott's conduct constituted knowing participation in the illegal drug market, including but not limited to: knowingly supplying suspicious quantities of opioids to suspect patients who were showing signs of addiction or participation in diversion; knowingly supplying suspicious quantities of opioids which were not medically justified; knowingly supplying suspicious quantities of opioids which quantities necessarily reflected diversion; and knowingly failing to implement effective controls and procedures to guard against diversion of opioids.

#### 2. Cindy Scott Fueled the Illegal Drug Market by Unlawfully Prescribing Opioids and Facilitating the Operation of Pill Mills

301. Defendant Cindy Scott is a registered nurse and advanced practice nurse who has practiced in Davidson County.

302. Scott was widely known by the pharmaceutical industry and medical community at-large as a prolific prescriber of opioids. Between 2012 and 2014, Scott was identified by the Tennessee Department of Health ("TDOH") as one of the Top 50 prescribers of controlled substances in the state.

303. When opioid producers promoted their branded opioids through their sales forces, Scott was a frequent and favorite target. She was so important to Endo's Opana ER business that

an Endo sales representative enlisted the help of his district manager to sit down with her when he heard that she was considering writing prescriptions for only generic opioids.

304. Scott has worked for pill mill after pill mill, including the Cookeville Center for Pain Management (from May 2012 to January 2014) and HopeHealth, LLC in Nashville (from January 2014 until HopeHealth's pain management certificate was suspended by the TDOH).

305. The Cookeville Center for Pain Management (and its management company and owner) was required to pay more than $1.45 million to resolve a civil whistleblower suit for, as then-Attorney Jeff Sessions put it, "overprescribing opioids…in [its] own financial interests, at the expense of the patients' best interests."

306. The TDOH similarly suspended HopeHealth's pain management certificate for its failure to retain a medical director. The TDOH's suspension order explained that HopeHealth could not keep a medical director because:

> [Medical Directors had] serious concerns…with the amount of, and frequency with which patients were being provided, controlled substances by [HopeHealth] and its providers, the refusal of [HopeHealth] and its providers to follow [Medical Directors'] instructions about tapering the amount of opioids and benzodiazepines being prescribed to certain patients, the inadequate and inconsistent patient charting by the providers of [HopeHealth], and the unwillingness of [HopeHealth] and its providers to implement protocols [they] felt were necessary and appropriate.

307. Scott was an integral part of these pill mills and their illegal operations. She explained to clinic employees that patients "should never expect to see a doctor on-site." Scott would submit false diagnoses "that would yield the prescription…the patient wanted (i.e., a medication with high 'street' value)" and was instrumental in teaching other employees how to do the same.

308. Scott's unscrupulous and rampant opioid prescribing drew the attention of the TDOH. On November 29, 2016, Scott was disciplined by the TDOH for her "haphazard and

unprofessional prescribing practices." The TDOH's consent order cited numerous violations, including Scott's failure to conduct adequate examinations to justify her opioid prescriptions, Scott's failure to appropriately document her treatment, and Scott's failure to inquire into patients' substance abuse history or their potential for substance abuse.

309. The TDOH concluded that Scott's opioid "prescribing…was non-therapeutic in nature, neither justified nor medically necessary for the patients' diagnoses, and not for a legitimate purpose." The TDOH explained that Scott "often prescribed monthly prescriptions to individual patients exceeding a daily dosage of five hundred (500) morphine milligram equivalents…include[ing] inappropriate combinations of long and short acting opioids often combined with high amounts of benzodiazepine and/or carisoprodol.

310. The TDOH ultimately placed her RN license on probation for 5 years, suspended her APN license for 2 years, and required that she surrender her DEA registrations "for all schedules of controlled substances and agree[] to not seek reinstatement of such DEA privileges for a period of five years."

311. Scott's unlawful actions also drew the ire of the Department of Justice. On January 22, 2018, Scott entered into a settlement agreement with the United States and the State of Tennessee to settle civil claims relating to "controlled substance prescriptions prescribed, ordered, and/or dispensed by Scott to patients as part of a prescribing pattern that was not for a legitimate medical purpose." In addition to a $32,000 settlement payment, Scott agreed to surrender her DEA registration and not seek reinstatement until December 1, 2021.

312. Scott's conduct constituted knowing participation in the illegal drug market, including but not limited to: knowingly supplying suspicious quantities of opioids to suspect patients who were showing signs of addiction or participation in diversion; knowingly supplying

suspicious quantities of opioids which were not medically justified; knowingly supplying suspicious quantities of opioids which quantities necessarily reflected diversion; and knowingly failing to implement effective controls and procedures to guard against diversion of opioids.

### 3. Hemal Mehta and Heather Marks, individually and in concert with one another, Fueled the Illegal Drug Market by Unlawfully Prescribing Opioids and Operating a Pill Mill

313. Hemal Mehta is a doctor practicing in Davidson County and the larger Nashville Metropolitan area. Heather Marks is an Advanced Practice Registered Nurse who practiced under Mehta's supervision from 2015 through 2018.

314. Mehta was one of the area's most prolific opioid prescribers and a favorite target of the Producer Defendants. From 2008 until it stopped detailing doctors at the end of 2016, Endo alone called on Mehta over 300 times.

315. Mehta was such a devout prescriber of Endo products that Endo nominated him to be one of its key opinion leaders wherein it would pay him to evangelize to other potential prescribers the supposed benefits and safety of Opana ER.

316. However, Mehta and Marks were not issuing these opioid prescriptions legally. For years, Mehta and Marks's prescribing habits were scrutinized by the State of Tennessee and, eventually, the federal government.

317. On April 10, 2019, Marks was indicted as part of the Appalachian Regional Prescription Opioid Strike Force for the unlawful distribution of oxycodone and oxymorphone.

318. Further investigation revealed that Marks was not acting alone. The Strike Force's investigation revealed that Marks was helping Mehta run a pill mill for the purpose of "distribut[ing] and dispens[ing] Schedule II controlled substances, including oxycodone and

oxymorphone, without a legitimate medical purpose and outside the usual course of professional practice."

319. On October 23, 2019, Mehta was added as a co-defendant in a superseding indictment, which alleged that Mehta and Marks both conspired to unlawfully distribute opioids, and from December 22, 2016, to April 25, 2018, Mehta and Marks unlawfully distributed oxymorphone and oxycodone on at least nine separate occasions.

320. Mehta and Mark's conduct, both individually and in concert, constituted knowing participation in the illegal drug market, including but not limited to: knowingly supplying suspicious quantities of opioids to suspect patients who were showing signs of addiction or participation in diversion; knowingly supplying suspicious quantities of opioids which were not medically justified; knowingly supplying suspicious quantities of opioids which quantities necessarily reflected diversion; and knowingly failing to implement effective controls and procedures to guard against diversion of opioids.

#### 4. **James Maccarone Fueled the Illegal Drug Market by Unlawfully Prescribing Opioids and Operating a Pill Mill**

321. James Maccarone was a doctor who operated a pill mill in Clarksville, Tennessee until his arrest on federal drug charges in July 2021.

322. Maccarone's pill mill was notorious for the ease with which a patient could obtain a prescription for opioids, such that patients would travel from hundreds of miles away to obtain opioid prescriptions.

323. Although Maccarone's pill mill was located nearly 60 miles away in Clarksville, he was one of the highest prescribers of opioids for a number of Davidson County pharmacies.

324. On July 22, 2021, Maccarone, along with three other individuals, was indicted for unlawfully distributing and conspiracy to distribute narcotics, including oxycodone, oxymorphone, and methadone from at least July 2016 through March 2021.

325. On January 24, 2022, Maccarone pleaded guilty to conspiracy to unlawfully distribute controlled substances, to wit—opioids.[88]

326. Maccarone admitted that his opioid prescribing "repeatedly failed to adhere to accepted professional standards for prescribing controlled substances for the treatment of chronic pain," and that he issued prescriptions to patients whom "exhibited obvious signs of drug diversion and abuse."

327. Maccarone further admitted that some of his patients "subsequently distributed the drugs obtained from those prescriptions to others" and that they "understood that if they paid the high case fees [Maccarone] charged, [Maccarone] would prescribe them oxycodone, oxymorphone, and other controlled substances that could be abused or sold for a profit."

328. Maccarone admitted that he unlawfully wrote prescriptions for at least 32,722 oxycodone pills and 12,258 oxymorphone pills.

329. Maccarone's conduct constituted knowing participation in the illegal drug market, including but not limited to: knowingly supplying suspicious quantities of opioids to suspect patients who were showing signs of addiction or participation in diversion; knowingly supplying suspicious quantities of opioids which were not medically justified; knowingly supplying suspicious quantities of opioids which quantities necessarily reflected diversion; and knowingly failing to implement effective controls and procedures to guard against diversion of opioids.

---

[88] *See U.S. v. Maccarone*, 6:21-CR-00019-REW-HAI (E.D. Ky.), Dkt. 146, Plea Agreement (1/24/22).

### 5. **<u>Pardue's Pharmacy Fueled the Illegal Drug Market Repeatedly Making Suspicious Orders for Opioids and Filling Opioid Prescriptions for Notorious Regional Pill Mills and Problem Prescribers</u>**

330. Pardue's Pharmacy ("Pardue's") is an independent pharmacy operating in Davidson County.

331. Pardue's has long been one of Davidson County's highest dispensers of opioids, enthusiastically accepting prescriptions from notorious pill mill prescribers. Many of Pardue's top opioid prescribers have since been arrested, lost their license, or are now practicing on restricted licenses, Cindy Scott (whose unlawful conduct was detailed above).

332. Pardue's would regularly fill opioid prescriptions for patients exhibiting obvious signs of abuse, addiction, and/or diversion. Pardue's even witnessed these patients abusing opioids before they had left the premises, in one instance seeing a patient snort an opioid in the parking lot that it had just dispensed.

333. Nonetheless, Pardue's endeavored to meet the demand of these criminal prescribers and drug dealers by consistently ordering above its threshold for opioid products. If an order was rejected, Pardue's would demand an increase to its opioid thresholds and threaten to take its considerable book of business to another distributor if their demands were not met.

334. In order to avoid scrutiny and keep the opioids flowing, Pardue's worked in concert with its distributors to "game the system" by requesting their opioid thresholds (which are not supposed to be revealed to customers) and using that information to pattern its opioid orders such that the orders would not trigger a distributor's obligation to report the orders as suspicious.

335. Using these ordering tactics to keep up with the demand of its suspicious prescribers and clientele, from 2006 through 2014 alone, Pardue's was able to purchase approximately 296,304,000 MMEs of opioids.

336. Pardue's did not even take the most basic precautions to prevent these opioids from ending up on the black market. A 2015 audit by AmerisourceBergen, its primary distributor, revealed just how little Pardue's cared about its responsibility to maintain effective controls to prevent diversion, revealing such glaring red flags as:

- Having no formal, written pharmacy due diligence policy with regard to dispensing controlled substances;
- Pharmacists dispensing duplicate immediate-release opioids to the same patient(s) without noting/confirming that an established and legitimate clinical need;
- Pharmacists dispensing the "Holy Trinity" cocktail without noting/confirming an established and legitimate medical need;
- Dispensing disproportionate amounts of controlled substances, specifically Schedule II controlled substances (estimated to be between 80% to 90% of all prescriptions filled);
- Dispensing a disproportionate amount of prescriptions paid with cash (Pardue's reported 60% of its patients were cash-pay);
- Security concerns due to prior incidents involving significant thefts of controlled substances, including opioids such as Opana ER; and
- The Pharmacist-in-Charge's state pharmacist's license being on probation.

The PIC even told the auditor that he was "not comfortable with the amount of controlled substances being dispensed" and that he was "thinking about quitting." This PIC did not quit and remains Pardue's PIC to this day.

337. However, despite these obvious red flags of diversion (and the personal trepidations about the legality of its conduct), Pardue's continued to purchase and dispense opioids in obscene

quantities, purchasing an additional 1,192,711 opioid pills from June 26, 2015 through January 6, 2017.

338. Pardue's conduct constituted knowing participation in the illegal drug market, including but not limited to: knowingly supplying suspicious quantities of opioids to suspect patients who were showing signs of addiction or participation in diversion; knowingly supplying suspicious quantities of opioids which were not medically justified; knowingly supplying suspicious quantities of opioids which quantities necessarily reflected diversion; and knowingly failing to implement effective controls and procedures to guard against diversion of opioids.

## F. The Drug Producer Defendants Helped Create the Illegal Drug Market

### 1. In the 1990s, the Drug Producer Defendants Knew that Using Opioids for Non-Malignant Pain Creates a Serious Risk of Abuse and Diversion Yet Encouraged Opioid Sales and Distribution Practices That It Knew Have Those Effects

339. As stated by Tennessee's Commissioner of Health Dr. John Dreyzehener, "***in the 1990's, MDs started prescribing opioids in large volume to treat [nonmalignant] pain which has caused an opioid addiction problem***."[89] Douglas Varney, Commissioner of the Tennessee Department of Mental Health, speaking at a meeting of the Governor's Working Group, similarly concluded that "***[b]asically we are dealing with the fallout from the medical profession overprescribing opioids***."[90]

340. Up until the mid-1990s, physicians prescribed opioids primarily to cancer patients and persons recovering from surgery. Fearful of the addictive qualities of opioids, physicians would not generally prescribe them for long term chronic pain. As detailed in a review of the

[89] Tenn. Dep't of Mental Health and Substance Abuse Services, *Opioid Abuse Reduction Act Working Group*, at 22 (Nov. 10, 2015) [hereinafter *Working Group Report*] (emphasis added).
[90] *Id.* (emphasis added).

development of the opioid crisis published in the 2015 Annual Review of Public Health, "[p]rior to the introduction of OxyContin [by Purdue in 1995], many physicians were reluctant to prescribe OPRs [opioid pain relievers] on a long-term basis for common chronic conditions because of their concerns about addiction, tolerance, and physiological dependence."[91]

341. This research confirmed the mid-1990s consensus of medical providers regarding the dangers of opioids. According to the Agreed Statement of Facts signed by Purdue in connection with its 2007 guilty plea to federal criminal charges for misbranding OxyContin: "During the period February through March 1995, Purdue supervisors and employees obtained market research that included focus groups of forty primary care physicians, rheumatologists, and surgeons to determine their receptivity to using OxyContin for non-cancer pain… '***[t]he biggest negative of [OxyContin] was the abuse potential***.'"[92]

342. When branded opioids were introduced to the U.S. market, including Tennessee, the Producer Defendants carefully evaluated physicians' concerns about the risks of addiction associated with opioids and embarked on a highly successful campaign to convince physicians that opioids created minimal risk of addiction. Upon information and belief, the Producer Defendants knew that, if its efforts were successful, many people would become addicted to prescription opioids and that, as a consequence, abuse and illegal diversion would follow.

343. As the Producer Defendants' efforts demonstrated success in the form of rapid increases in opioid prescribing, other opioid producers joined in their efforts to expand the market for opioids.

[91] Andrew Kolodny, et al., *The Prescription Opioid and Heroin Crisis: A Public Health Approach to an Epidemic of Addiction*, 36 Ann. Rev. Pub. Health 559, 562. (2015).

[92] Information as to Purdue Frederick Co., Inc., U.S.A v. Purdue Frederick Co., Inc., No. 1:07-cr-00029 W.D. Va. May 10, 2007, ECF No. 5-2 at ¶19 (emphasis in original).

### 2. The Drug Producer Defendants Funded "Key Opinion Leaders" to Spread Misinformation Regarding Opioids

344. The Producer Defendants engaged "key opinion leaders" to promote the use of their opioids in a variety of ways. Each Producer Defendant would pay a key opinion leader an honorarium each time he or she agreed to attend a variety of functions, from intimate meals with a single pain management clinic's staff to presenting at huge national and international symposia. Key opinion leaders were selected based on a number of criteria such as the prestige of their affiliated hospitals and the quantity of their published articles, but most importantly their willingness to promote the prescription of opioids.

### 3. The Drug Producer Defendants Funded Dr. Russell Portenoy, Who Facilitated the Widespread Distribution and Abuse of Opioids by Acting as a Vocal Proponent of Opioid Use

345. The Drug Producer Defendants funded and worked closely with Dr. Russell Portenoy, a physician who emerged as one of the industry's most vocal proponents of long-term opioid use.[93] According to a Wall Street Journal article, Portenoy essentially made it "his life's work" to campaign for the movement to increase use of prescription opioids.[94] To this end, speaking on Good Morning America in 2010, Portenoy stated categorically that "[a]ddiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted." This program was broadcasted across the country and, upon information and

---

[93] Thomas Catan & Evan Perez, *A Pain Champion has Second Thoughts*, wsj.com (Dec. 17, 2012). Available at: https://www.wsj.com/articles/SB10001424127887324478304578173342657044604.
[94] *Id.*

belief, was widely watched, including within Tennessee and in Plaintiffs' community. Portenoy, who himself is facing lawsuits for his work as a paid opioid pitchman, has now conceded that this promotion of opioids for chronic pain was "clearly the wrong thing to do."[95] He is on record stating: "I gave innumerable lectures in the late 1980s and 90's about addiction that weren't true."[96]

346. The Drug Producer Defendants paid Dr. Portenoy millions of dollars from 1997 to 2007 to continue publicizing information that they knew would continue to create opioid addicts and would fuel the secondary illegal market for opioids. For example, in approximately 2004, Endo published an education pamphlet edited by Dr. Portenoy, called *Understanding Your Pain: Taking Oral Opioid Analgesics*, which claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems."[97] In funding Dr. Portenoy, the Drug Producer Defendants yet again knowingly helped foster the growing population of opioids addicts and perpetuated the illegal opioids market that serviced them and which would carry forward into the late 2010's.

347. Teva listed Dr. Portenoy as a "Key Opinion Leader" at various times.

#### 4. **The Drug Producer Defendants Funded the American Pain Foundation, Which Claimed (Among Other Things) That the Belief That "Opioid Pain Medications are Universally Addictive" was a Common Misconception**

348. The Drug Producer Defendants also funded the American Pain Foundation ("APF"), which has been described by the President of Physicians for Responsible Opioid Prescribing as "a front for opioid manufacturers."[98] The APF's 2010 annual report details

---

95 *Id.*
96 *Id.*
97 http://www.thblack.com/links/RSD/Understand_Pain_Opioid_Analgesics.pdf.
98 Charles Ornstein and Tracy Weber, *Patient Advocacy Group Funded by Success of Painkiller Drugs, Probe Fins*, washingtonpost.com, Dec. 23, 2011. Available at:

thousands of pro-opioid advertisements, public statements, letters, Facebook Posts, and similar communications. It states that: "Through online, print, radio, and television outlets, APF's local and national media outreach efforts secured 1,600 media stories on pain in 2010 – an increase of 1,255% from 2009. Reaching more than 600 million people with important pain-related messages, APF spokespeople and advocates provided education, information and assistance to people with pain and combated the negative stereotypes and stigmas associated with pain."[99] Upon information and belief, APF distributed the types of messages referenced in its 2010 Annual Report to physicians within Tennessee.

349. For example, in or around 2011, the APF published "Policymaker's Guide," which characterized the notion that "strong pain medication leads to addiction" as a "common misconception[]":

> Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive. As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.[100]

The guide describes "pain in America" as "an evolving public health crisis" and characterizes concerns about opioid addiction as misconceptions: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include: . . . ***Misconceptions about opioid addiction***."[101] It even characterizes as a

---

https://www.washingtonpost.com/national/health-science-/patient-advocacy-group-funded-by-success-of-painkiller-drugs-probe-finds/2011/12/20/gIQAgvczDP_story.html.

[99] American Pain Fund 2010 Annual Report. Available at: https://archive.org/stream/277604-apf-2010-annual-report/277604-apf-2010-annual-report_djvu.txt.

[100] *A Policymaker's Guide to Understanding Pain & Its Management*, American Pain Foundation at 5. Available at: http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last visited Dec 1, 2021).

[101] *Id.* at 6 (emphasis added).

"***myth***" that "***[c]hildren can easily become addicted to pain medications***."[102] This message is just one example of the types of messages that APF published with substantial financial support from the Drug Producer Defendants.

350. Upon information and belief, the Drug Producer Defendants funded the APF and supported it with the intention and expectation that APF's messaging would continue to create more opioid addicts and necessarily result in more illegal abuse and distribution of opioids – and knowing that precisely those effects were occurring nationwide, in Tennessee, and in the communities at issue in this case.

### G. Teva Also Contributed to the Illegal Prescription Opioid Market which Fuels Tennessee's Opioid Epidemic

#### 1. Teva Pushed Opioid Drugs for Unapproved Purposes

351. As described herein, Teva knowingly participated in the distribution chain of illegal opioids in Tennessee and in Baby Doe Plaintiffs' community by various means.

352. According to a DOJ press release that summarizes Teva's guilty plea for criminal violations of the Food and Drug Act, Teva trained its sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of Teva opioids and funded Continuing Medical Education ("CME") Courses to promote off-label uses. Specifically, the DOJ stated:

> From 2001 through at least 2006, ***[Teva] was allegedly promoting [Actiq] for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. [Teva] also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results***.[103]

---

[102] *Id.* at 40 (emphasis added).

[103] Press Release, U.S. Department of Justice, Pharmaceutical Company Teva To Pay $425 Million for Off-Label Drug Marketing (Sept. 29, 2008). Available at:

353. As a result of this unlawful marketing of Actiq, almost 90% of Actiq prescriptions were to patients for off-label, non-cancer use.

354. Then-acting U.S. Attorney Laurie Magid commented on the dangers of Teva's unlawful practices:

> This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line. People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved.[104]

**2. Teva Funded Pro-Opioid Publications and Presentations**

355. In addition to its direct marketing, Teva indirectly marketed through third parties to change the way doctors viewed and prescribed opioids - disseminating the messages that opioids were safe for the treatment of chronic, long-term pain, that they were non-addictive, and that they were under-prescribed to the detriment of patients who were needlessly suffering. Teva did so by sponsoring pro-opioid front groups, prescription guidelines, articles, and CMEs, and Teva paid physicians thousands of dollars every year to publicly opine that opioids were safe, effective and non-addictive for a wide variety of uses.

356. Through its sponsorship of the FSMB's "Responsible Opioid Prescribing: A Physician's Guide," Teva continued to encourage the prescribing of opioid medication to "reverse ... and improve" patient function, attributing patients' displays of traditional drug- seeking behaviors as merely "pseudoaddiction."

---

https://www.justice.gov/sites/default/files/civil/legacy/2014/01/09/Cephalon%20Press%20Release.pdf (emphasis added).

[104] *Id.*

357. Teva sponsored APF's guide, which warned against the purported under-prescribing of opioids, taught that addiction is rare and suggested that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.

358. A summary of the February 12-16, 2008 AAPM annual meeting reinforced the message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continues:

> ***Pain management is a fundamental human right*** in all patients not only with acute postoperative pain but also ***in patients suffering from chronic pain***. Treating the underlying cause of pain does not usually treat all of the ongoing pain. Minimal pathology with maximum dysfunction remains the enigma of chronic pain. Chronic pain is only recently being explored as a complex condition that requires individual treatment and a multidisciplinary approach. It is considered to be a disease entity.[105]

359. Teva also sponsored, through an educational grant, the regularly published journal Advances in Pain Management. In a single 2008 issue of the journal, there are numerous articles from Portenoy, Dr. Steven Passik, Dr. Kenneth L. Kirsh, and Webster, all advancing the safety and efficacy of opioids. In an article titled "Screening and Stratification Methods to Minimize Opioid Abuse in Cancer Patients," Webster expresses disdain for the prior 20 years of opioid phobia.

360. In another article from the same issue, "Appropriate Prescribing of Opioids and Associated Risk Minimization," Passik and Kirsh state: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-

---

[105] Mohamed A. Elkersh & Zahid H. Bajwa, Highlights From the American Academy of Pain Medicine 24th Annual Meeting, 2(1) Advances in Pain Management 50-52 (2008) (emphasis added).

recent work had shown "that opioids do have efficacy for subsets of patients who can remain on them long term and have very little risk of addiction."[106]

361. In November 2010, Fine and others published an article presenting the results of another Teva-sponsored study, concluding that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term benefits and harms of opioid therapy for chronic pain."[107] They also conclude that the number of abuse-related events was "small."[108]

362. From 2000 forward, Teva has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and did not treat cancer pain. These doctors included Portenoy, Fine, Passik, Kirsh, and others.

### H. **From 2012-2017, Jannsen and other Producers of Opioids Helped Funnel Millions of Dollars to Advocacy Groups that Promoted Opioid Use**

363. On February 13, 2018, Senator Claire McCaskill, released a report showing that Jannsen and other producers funneled over $10 million to 14 advocacy groups and affiliated doctors who took "industry friendly positions," which included issuing medical guidelines promoting opioids for chronic pain, lobbying to defeat or include exceptions to state limits on

[106] Steven D. Passik & Kenneth L. Kirsh, *Appropriate Prescribing of Opioids and Associated Risk Minimization,* 2(1) Advances in Pain Management 9-16 (2008).
[107] Perry G. Fine, et al., Long-Term Safety and Tolerability of Fentanyl Buccal Tablet for the Treatment of Breakthrough Pain in Opioid-Tolerant Patients with Chronic Pain: An 18-Month Study, 40(5) J. Pain & Symptom Management 747-60 (Nov. 2010).
[108] *Id.*

opioid prescribing, and criticizing prescribing guidelines from the U.S. Centers for Disease Control and Prevention. The Report states that as these industry-funded entities and affiliated physicians:

> [o]ften echoed and amplified messages favorable to increased opioid use – and ultimately the financial interest of opioid manufacturers. These groups have issued guidelines and policy minimizing the risk of opioid addiction and promoting opioids for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for over-prescription and misbranding. Notably, a majority of these groups also strongly criticized 2016 guidelines from the Centers for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain – the first national standards for prescription opioids and a key federal response to the ongoing epidemic.
>
> The fact that these same manufacturers provided millions of dollars to the group described [in this report] suggests, at the very least, a direct link between corporate donations and the advancement of opioids-friendly messaging. By aligning medical culture with industry goals this way, the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioids epidemic.[109]

### I. __The Drug Producer Defendants Knowingly Fostered Opioid Addiction and Fueled the Illegal Opioids Market in Which They are Now Knowingly Participating__

364. The Drug Producer Defendants' promotion of opioids gave rise to and fueled the illegal drug market that existed in Plaintiffs' community during all periods relevant to this suit. Their representations regarding the risks of opioids and actions taken to push opioids through aggressive marketing of their collective message contributed to the market for both illegally prescribed opioids and for diverted opioids (and heroin for those addicts who could no longer obtain or afford prescription opioids).

---

[109] Fueling an Epidemic, Report Two: *Exposing the Financial Ties Between Opioid Manufacturers and Third Party Advocacy Group*, U.S. Homeland Security & Governmental Affairs Committee, Ranking Member's Office, https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/REPORT-Fueling%20an%20Epidemic-Exposing%20the%20Financial%20Ties%20Between%20Opioid%20Manufacturers%20and%20Third%20Party%20Advocacy%20Groups.pdf.

365. As set forth in the examples above, the Drug Producer Defendants operated websites and/or funded third party physicians, organizations, and websites that all pushed the message that opioids were not highly addictive and/or were appropriate for long-term use to treat chronic pain.

366. Upon information and belief, the Drug Producer Defendants chose not to fund any organizations and third parties who promoted the contrary (and scientifically supported) message that opioids were highly addictive and not suitable for long-term use to treat chronic pain. It also chose not to pull funding from the pro-opioids organizations.

367. Upon information and belief, the Drug Producer Defendants made these choices knowing and expecting that by doing so, the opioids market would continue to expand and continue to create more opioid addicts dependent on the illegal diversion of their products.

368. Speaking before the House Opioid Task Force in 2017, Dr. Michael Baron of the Tennessee Board of Medical Examiners summed up the cumulative effect of the opioid producers' multi-year campaign:

> We came out with what I call 'Generation O.' A whole generation of physicians that were taught it's ok to prescribe opiates, that they're safe, and that it's what the patient wants. But we bypassed evidence-based medicine. The whole medical system was hijacked by industry and really agreed.
>
> [***]
>
> The triggers of the opioid epidemic were really the pharmaceutical industry and pain experts that were on the payroll of the pharmaceutical industry. And they preached that opioids are safe and effective for chronic, non-cancer pain, the risk of addiction is rare, and opioid therapy can be easily discontinued, all of which is nonsense.[110]

**J. <u>The Drug Producer Defendants, the Drug Distributor Defendants, and the Pharmacy Chain Defendants Engaged in a Conspiracy to Profit from the</u>**

[110] House Opioid Task Force, February 23, 2017.

**Illegal Opioid Market by Any Means Necessary Which Exacerbated the Opioid Epidemic**

369. Through chargeback data, the Drug Producer Defendants had visibility into the extravagant opioid orders being placed by independent and retail chain pharmacies, including those owned and operated by the Pharmacy Chain Defendants.

370. Upon information and belief, instead of reporting these orders to law enforcement and refusing to honor these rebates, the Drug Producer Defendants almost always continued to supply the Pharmacy Chain Defendants and others with opioids at a discounted rate to maximize their profits.

371. Upon information and belief, the Distributor Defendants were in regular contact with the Drug Producer Defendants about potentially suspicious pharmacies; but as long as the Drug Producer Defendants continued to honor chargebacks, the Distributor Defendants continued to fill these pharmacies' suspicious orders, especially if the pharmacy at issue was one of the Pharmacy Chain Defendants.

372. Upon information and belief, the Pharmacy Chain Defendants knew that the Distributor Defendants fiercely competed with one another for their substantial books of business. As a prerequisite to gifting the Distributor Defendants their accounts, the Pharmacy Chain Defendants would demand that all of their locations be exempted from the Distributor Defendant's SOM system until their exorbitant monthly orders of opioids would not be identified as "suspicious" by the Distributor Defendants. Even when an order for a Pharmacy Chain Defendant was identified by a Distributor Defendant's SOM system, the Distributor Defendant would expediate a threshold increase to clear the order. The Distributor Defendants were so worried about losing the Pharmacy Chain Defendants' business that they would proactively reach out to the

Pharmacy Chain Defendants when their SOM team saw a Pharmacy Chain Defendant location nearing its threshold for opioids.

373. Upon information and belief, as self-distributors of opioids themselves at certain points, the Pharmacy Chain Defendants understood that the Distributor Defendants had obligations to monitor for suspicious orders, but nevertheless demanded (and received) threshold increases for what the Pharmacy Chain Defendants clearly knew were suspicious orders for opioids. The Drug Producer Defendants witnessed and enabled these unlawful ordering tactics by continuing to grant chargebacks for the Pharmacy Chain Defendants, and encouraged the Distributor Defendants to keep the opioids flowing to these suspicious pharmacies.

374. The Drug Producer Defendants, the Distributor Defendants, and the Pharmacy Chain Defendants knew or should have known that their concerted and coordinated effort to subvert Tennessee state law resulted in the diversion of opioids into the illegal drug market, including the illegal drug markets in Tennessee and Baby Doe Plaintiffs' community.

### K. The United States, and Tennessee in Particular, is Plagued by Rampant Opioid Abuse Driven by Defendants Perpetuating an Illegal Market for Prescription Opioids

#### 1. Opioids are Abused and Diverted at Alarming Rates

375. The increasing demand, and high availability, of prescription opioids correlates with increased addiction, abuse, and diversion (a term used to describe redistribution of prescription drugs for illegal uses) throughout the country, including Tennessee and Baby Doe Plaintiffs' community. According to the Centers for Medicare & Medicaid Services, "'[d]rug diversion' is best defined as the diversion of licit drugs for illicit purposes. It involves the diversion

of drugs from legal and medically necessary uses towards uses that are illegal and typically not medically authorized or necessary."[111]

376. Opioid misuse is a national epidemic. For example, the federal government estimated that ***11.5 million people*** had abused opioid pain relievers in 2016, including approximately ***4.4% of all people in the United States aged 12 or older***.[112] These statistics are disturbing, indicating that about 1 in 20 people in the U.S. are abusing opioids.

377. Unfortunately, the situation in Tennessee is no better, and indeed may be worse. During 2013 – 2014, the State of Tennessee estimated that nearly 5% (221,000) of adults in Tennessee used pain relievers for non-medical purposes. Of these, the State estimated that 69,100 Tennesseans were addicted to prescription opioids and required treatment for prescription opioid abuse. The other 151,900 were using prescription opioids in ways that could be harmful and may benefit from early intervention strategies.[113] Not surprisingly, opioids abuse continues to go hand in hand with an illegal drug market from which the Defendants are knowingly deriving substantial profits.

---

[111] "Drug Diversion in the Medicaid Program: State Strategies for Reducing Prescription Drug Diversion in Medicaid," Centers for Medicare & Medicaid Services (Baltimore, MD: January 2012), p. 1., accessible at https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud Prevention/MedicaidIntegrityProgram/downloads/drugdiversion.pdf.

[112] https://www.samhsa.gov/data/sites/default/files/NSDUH-FFR1-2016/NSDUH-FFR1-2016.htm#opioid.

[113] "Prescription for Success: Statewide Strategies to Prevent and Treat the Prescription Drug Abuse Epidemic in Tennessee," Tennessee Department of Mental Health and Substance Abuse Services et al., (Summer, 2014), pg. 9, accessible at https://web.archive.org/web/20160414040557/https://www.tn.gov/assets/entities/behavioral-health/sa/attachments/Prescription_For_Success_Full_Report.pdf ("Prescription for Success").




### 2. The Defendants are Aware of a Nationwide Problem

378. Trends in opioid production, prescriptions, and usage over the last decade put drug producers and distributors on notice of a heightened risk of abuse and diversion nationwide. For example:

a. according to the Working Group Report, "[s]ince 1999, there has been no overall change in the amount of pain experienced by Americans, yet the number of prescriptions for opioids has quadrupled[;]"[114]

b. in the past two decades, the rate of opioid prescribing in the United States has increased 600%. The United States accounts for 4.6% of the world population but its citizens, by 2011, were consuming 80% of the world's opioid production;[115]

---

[114] *Working Group Report* at 3.

[115] *Id.* (citing Daneshvari R. Solanki et al., *Monitoring Opioid Adherence in Chronic Pain Patients: Assessment of Risk of Substance Misuse*, 14 Pain Physician J. 119, 120 (2011)).

c. between 2009 and 2013, both the number of prescriptions filled per patient and the number of days of medication per prescription increased by approximately 8.4%;[116]

d. nearly half (46.9%) of new opioid users who take these medications for more than 30 days in the first year continue using them for three years or longer. Signaling a particularly alarming trend, nearly 50% of these patients are only taking short-acting opioids — which can make them more prone to addiction — rather than long-acting formulations, which are designed for extended pain relief; [117]

e. on average, the patients who chronically used these medications filled 56 short-acting opioid prescriptions over three years — nearly 19 prescriptions each year;[118] and

f. prescription opioid overdose deaths quadrupled in parallel with prescription opioid sales in the United States between 1999 and 2010.[119]

379. Defendants know that production volumes of opioids skyrocketed in the last twenty-five years. In 1993, the DEA allowed pharmaceutical companies to produce 3,520 kilograms of oxycodone. In 2015, the DEA authorized production of 137,500 kilograms of oxycodone. That's a 39-fold increase in 22 years.

380. Defendants are also well-aware that for 2018, the DEA proposed a 20% reduction in the number of prescribed schedule II opioid painkillers that can be produced in the United States, with Acting Administrator Chuck Rosenberg warning that "Physicians, pharmacists, and patients must recognize the inherent risks of these powerful medications, especially for long-term use."

### 3. <u>The Stream of Opioids into Tennessee is Alarmingly High and Put Defendants on Notice of Abuse and Diversion</u>

[116] "A Nation in Pain" by Express Scripts, 2015.
[117] *Id.*
[118] *Id.*
[119] *Id.*

381. Tennessee currently has the third highest statewide opioid prescription rate in the nation.[120] Indeed, Tennessee doctors in 2015 wrote more than 7.8 million opioid prescriptions — or ***1.18 prescriptions for every man, woman and child in the State***, placing Tennessee number 2 in the nation among all States for the number of opioid prescriptions per capita according to IMS Health data. By contrast, California with its population of 38.8 million people only had 0.48 prescriptions per capita in 2015. As reported by the CDC, Tennessee's oxycodone prescription rate is twenty-two times that of Minnesota's. As reported by Commissioner of Health Dreyzehner in 2015 his presentation "Neonatal Abstinence Syndrome, a Tennessee Perspective," ***51 hydrocodone pills and 21 oxycodone pills were prescribed for every Tennessean*** during the period covered by that report. The same report details the dramatic, multi-fold increase in opioid prescriptions since 1999, in the absence of any meaningful increase in patients experiencing chronic pain.

382. According to the Tennessee Department of Health's Drug Overdose Dashboard, there were 7,636,112 opioid prescriptions written in Tennessee in 2016 alone.[121] The State is currently dispensing opioids at rate of 68.5 opioid prescriptions per 100 persons.[122]

383. According to IMS Health Data, the number of prescriptions of popular branded and generic opioid products containing hydromorphone, oxymorphone, oxycodone, and hydrocodone in the State of Tennessee totaled 6,148,823 for the 12-month period of September 2015 through August 2016, and 5,639,429 for the 12-month period of September 2016 through August 2017.

---

[120] *See* https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.
[121] Tennessee Drug Overdose Dashboard.
[122] Center for Disease Control, *U.S. State Opioid Dispensing Rates, 2020*, https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

This means in just over a two-year period, Tennesseans received more than 11.7 million of these prescriptions.

### 4. <u>The Opioid Epidemic Has Devastated Tennessee Communities</u>

384. It is difficult to overstate the human, economic, and societal toll that the opioid epidemic and associated abuse and diversion have wrought in Tennessee. The levels of opioid abuse in Tennessee are staggering: Tennessee and the Baby Doe Plaintiffs' community are awash in opioids, plagued by high levels of opioid-induced deaths and babies born with NAS, and racked by an illegal opioids market. The flood of opioids has had – and continues to have – predictably devastating effects on Tennessee communities, including Plaintiffs' community. This includes staggering rates of addiction, opioid-related deaths, and babies born with NAS, along with the presence of criminal drug trafficking rings.

385. "Opioid overdoses, mainly from prescription drugs, are … the leading cause of the recent unexpected rise in the mortality rate of middle-aged white Americans, particularly women in rural areas, after decades of steady decline."[123]

386. As recently as 2016, the preeminent medical journal in the United States concluded that "[t][wo major facts can no longer be questioned. First, opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions….Second, the major source of diverted opioids is physician

[123] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'*, washingtonpost.com, Oct. 22, 2016, available at: https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

prescriptions."[124] Overdose deaths increased in Tennessee from 342 in 1999 to 2,388 in 2020, the last year for which overdoses have been calculated.[125] That represents a nearly 600% increase. Tragically, the rates of opioid deaths in Tennessee outpace the national average by a wide margin. The vast majority of overdose deaths in Tennessee – nearly 72% in 2015 – involved opioids.[126] From 2012 to 2020 (the last year for which data has been reported), Tennessee set a new record each year for the number of opioid overdose deaths, with 2,388 in 2020 alone.[127] The rate in 2020 equated to more than 6 opioid overdose deaths in Tennessee every single day.

**Rates of Opioid Related Overdose Deaths (rate per 100,000 Population)**
**Tennessee and United States, 1999-2010**




Between 2005 and 2015, just one decade, unintentional overdose deaths in Tennessee increased over 250%. Unintentional overdose deaths now account for more early deaths in Tennessee than automobile accidents, suicides, or homicides.[128]

---

[124] "Opioid Abuse in Chronic Pain — Misconceptions and Mitigation Strategies," Nora D. Volkow, M.D., and A. Thomas McLellan, Ph.D., N Engl J Med 2016; 374:1253-1263 (March 31, 2016), accessible at http://www.nejm.org/doi/full/10.1056/NEJMra1507771.
[125] Tennessee Drug Overdose Dashboard.
[126] *Id.*
[127] *Id.*
[128] *Working Group Report* at 4.

387. Defendants also contributed to NAS deaths in Tennessee. NAS is a clinical diagnosis, and "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."[129]

388. According to a report produced by Governor Bill Haslam's Opioid Abuse Working Group pursuant to 2015 Tenn. Pub. Acts Ch. 389 ("Governor's Working Group Report"), "***[t]he number of babies born with Neonatal Abstinence Syndrome (NAS). . . increased tenfold from 2000 to 2010***."[130] Since 2010, the problem has only gotten worse.

389. Along with overdose deaths, the number and rate of NAS – a condition suffered by babies born to mothers addicted to opioids – has also increased dramatically in Tennessee since 2007:

[129] Prabhakar Kocherlakota, *Neonatal Abstinence Syndrome*, 134(2) Pediatrics 547, 547-48 (2014), *available at* http://pediatrics.aappublications.org/content/pediatrics/134/2/e547.full.pdf.
[130] *Working Group Report* at 4 (emphasis added).




390. As illustrated by the following map, researchers analyzing hospital discharge data have determined that Tennessee, along with its border states Kentucky, Alabama, and Mississippi, have the highest rates of NAS births in the nation.[131]

[131] Stephen W. Patrick et al., *Increasing Incidence of Neonatal Abstinence Syndrome: United States 2009-2012*, 35(8) J. Peronatol. 650, 650-55.




391. The percentage of pregnant women served by the Tennessee Department of Mental Health & Substance Abuse Services—42.3% in 2012—listing prescription opioids as their primary substance of abuse was over twice the percentage in the United States overall (18.4% in 2012).

392. TennCare eligibility records establish that 24.3% of babies born with NAS in 2012 were placed in the Department of Children's Services' custody within one year of birth.[132]

393. The epidemic of NAS babies is an outgrowth of the explosion in the amount of opioids in Tennessee since the mid-1990s. As the Appalachia HIDTA recognized in its 2015 Annual Report:

> [T]he state of Tennessee and east Tennessee in particular, is plagued by an epidemic of opioid abuse, which has unfortunately now resulted in a resurgence of heroin as a growing threat. A consequence of this opioid abuse is the alarming number of children being born dependent on opioids, afflicted with Neonatal Abstinence Syndrome (NAS). Children born with NAS suffer extreme physical symptoms of withdrawal and require specialized care in the neonatal wards of hospitals. This

---

[132] *Working Group Report* at 4.

treatment often consists of children being given smaller doses of methadone or similar drugs, over time, to break their addiction to opioids.[133]

394. The direct link between the flood of prescription opioids and the NAS baby crisis in Tennessee has been clearly stated by Tennessee's Commissioner of Health Dr. John Dreyzehner. In a 2015 presentation entitled "Neonatal Abstinence Syndrome: A Tennessee Perspective," Commissioner Dreyzehner addressed "***the Substance Abuse Epidemic and resulting NAS epidemic***."[134]

395. In his NAS presentation, Commissioner Dreyzehner identified the obvious link between opioid sales and opioid related health problems, noting "the incredible correlation between sales and supply and availability [of opioids] and opioid related deaths and opioid treatment admissions."[135]

396. Additionally, Dr. Stephen Loyd, Medical Director of the Tennessee Department of Mental Health and Substance Abuse Services, recently testified before the Tennessee House of Representatives' Opioid Task Force ("House Opioid Task Force") that: "[m]arketing of opioids as having a low addictive potential when used for the treatment of chronic pain" resulted in "opioids prescribed more freely by practitioners," and, in turn, an "increase in number of babies born drug dependent."[136]

---

[133] U.S. Dep't of Justice, Appalachia High Intensity Drug Trafficking Area, CY2015 Annual Report, at 4 (2015).
[134] National DEC, "Neonatal Abstinence Syndrome A Tennessee Perspective," Vimeo, May 4, 2015. Available at: https://vimeo.com/126839454 (emphasis added).
[135] *Id.*
[136] House Opioid Task Force, February 23, 2017.

397. The Nationwide epidemic of NAS has a focal point in Tennessee.[137] The statistics are alarming:[138]

a. in 2015, 12.1 of every 1,000 babies were born with NAS in Tennessee;

b. in 2016, 12.2 of every 1,000 babies were born with NAS in Tennessee;

c. in 2017, 13.5 of every 1,000 babies were born with NAS in Tennessee;

398. Among other issues, NAS babies experience long-term difficulties, including but not limited to the following types of effects: poor performance in school;[139] higher risk of developmental disabilities and the accompanying need for special needs services;[140] and lower cognitive function.[141] Thus, the Baby Doe Plaintiffs will likely suffer long-term effects that will require lifelong treatment and special education expenses, and the Baby Doe Plaintiffs may suffer sustained (perhaps lifelong) cognitive impairments.

### L. <u>In Addition to Death and NAS, the Opioid Abuse and Diversion Enabled by Defendants has Other Deleterious Economic and Societal Consequences</u>

399. In addition to these health effects, the flood of opioids into Tennessee corresponds to lost productivity and increases in crime, children in State custody, and treatment and healthcare

[137] The TN Department of Health has tracked statistics related to babies with NAS from which the following statistical data has been gathered. Available at: https://www.tn.gov/health/article/nas-update-archive.html.

[138] *Id.*

[139] *Neonatal Abstinence Syndrome and High School Performance* (Jan. 16, 2017), available at: http://i2.cdn.turner.com/cnn/2017/images/01/16/neonatal.abstinence.syndrome.and.high.school.performance.pdf.

[140] https://consumer.healthday.com/pregnancy-information-29/pregnancy-drugs-news-545/babies-born-addicted-to-opioids-often-struggle-with-learning-722293.html (summarizing results of CDC study of NAS-born babies in Tennessee).

[141] Nygaard, Egil, et al., *Longitudinal Cognitive Development of Children Born to Mothers with Opioids and Polysubstance Abuse*, Pediatric RESEARCH, Vol. 28 No. 3 (Sept. 2015).

costs.[142] In a 2013 report, the State of Tennessee itself identified prescription drug as the cause of these deleterious effects:[143]

## SUMMARY OF THE PRESCRIPTION DRUG EPIDEMIC IN TENNESSEE

**Who Abuses Prescription Drugs?**

- In 2012, prescription opioids became the primary substance of abuse for people in Department of Mental Health and Substance Abuse Services-funded treatment, overtaking alcohol for the first time.
- Almost 5% of Tennesseans have used pain relievers in the past year for non-medical purposes.
- Young adults (18-25-year-olds) in Tennessee are using prescription opioids at a 30% higher rate than the national average.

**Access to Prescription Drugs**

- **High Number of Prescriptions Dispensed**
    - There were 25% more controlled substances dispensed in Tennessee in 2012 than in 2010.
- **Doctor Shopping**
    - In March 2013, 2,010 people received prescriptions for opioids or benzodiazepines from four or more prescribers.
- **Prescribing Practices**
    - As of August 1, 2013, 25 physicians had been prosecuted for overprescribing during 2013.
- **Sources of Prescription Drugs**
    - More than 70% of people who use prescription drugs for non-medical reasons got them from a friend or relative.

**Consequences of Prescription Drug Abuse**

- **Healthcare Costs**
    - The number of emergency department visits for prescription drug poisoning has increased by approximately 40% from 2005 to 2010.
- **Overdose Deaths**
    - There has been a 220% increase in the number of drug overdose deaths from 1999 to 2012 (342 in 1999 to 1,094 in 2012).
- **Criminal Justice System Involvement**
    - Drug-related crimes against property, people and society have increased by 33% from 2005 to 2012.
- **Lost Productivity**
    - The cost of lost productivity due to prescription drug abuse in Tennessee was $142.9 million in 2008. This number adjusted for 2013 inflation is $155.2 million.
- **Children in State Custody**
    - About 50% of the youth taken into Department of Children's Services custody resulted from parental drug use.
- **Neonatal Abstinence Syndrome**
    - Over the past decade, we have seen a nearly ten-fold rise in the incidence of babies born with Neonatal Abstinence Syndrome in Tennessee.
- **Treatment Costs**
    - It is estimated that the cost of providing state-funded treatment services to individuals that abuse prescription drugs and live below the poverty level would cost $27,933,600.

---

142 "Prescription for Success" at p. 9.
143 *Id.*

400. As the graphic below reflects, opioid overdose deaths represent only the "tip of the iceberg" of the human and societal costs of the opioid epidemic:[144]




401. According to a recent article by the Tennessean, the "substance abuse epidemic – most notably involving opioids" -- costs Tennessee more than $2 billion annually.[145] That $2 billion annual price tag includes $46 million for babies born in Tennessee with NAS; $422.5 million for hospitalizations associated with opioid abuse; and another $372,440 in emergency room visits associated with opioid abuse.[146] However, the largest component of the substantial

---

[144] Benjamin Schachtman, *'Closer to Home' – The Cost of the Opioid Epidemic May be the Tip of the Iceberg*, portcitydaily.com, Apr. 3, 2017 (attributing graphic chart to the N.C. Public Health Department). Available at: http://portcitydaily.com/2017/04/03/closer-to-home-the-cost-of-the-opioid-epidemic-may-be-the-tip-of-the-iceberg/.

[145] Holly Fletcher, *Drug, alcohol abuse saps $2 billion from Tennessee annually – an under-the-radar impact of the opioid epidemic*, USA TODAY NETWORK – Tennessee (Dec. 3, 2017). Available at: https://www.tennessean.com/story/money/industries/health-care/2017/12/04/drug-alcohol-abuse-saps-2-billion-tennessee-annually-under-the-radar-impac.

[146] *Id.*

yearly costs is the $1.29 billion in "lost income from having an estimated 31,000 people, or 1 percent of the workforce, out of jobs.[147] As the article further explains:

> Teresa Waters, the chair of preventive medicine at the University of Tennessee Health Sciences Center and person responsible for compiling the data used in the Tennessean article, said she "took a conservative approach to the analysis so the overall economic impact and state spending is likely higher." In particular, Waters noted that "she didn't include costs associated with substance abuse overdoses because of debate over how to estimate economic impact from early loss of life."[148]

402. Defendants' creation and/or expansion of the opioid market has given rise to a market for heroin in Tennessee, made up largely of addicts who can no longer afford diverted prescription opioids available on the black market. There is a relationship between opioid pain reliever use and heroin use. According to the federal government's National Survey on Drug Use and Health, four out of five heroin addictions begin with opioid prescription pain relievers.[149]

403. On November 13, 2015, E. Douglas Varney, Commissioner of the Tennessee Department of Mental Health, issued a message detailing the recent rise of heroin abuse in Tennessee.[150] In the message, Varney explained that, as the state "forged efforts to reduce availability of opioid based pain remedies, in the shadows, heroin arrived on the scene. It arrived like a tidal wave in Tennessee. It's a far more potent form of opioids, cheaper, more dangerous and more lethal."[151] Varney referenced data from multiple sources showing heroin, and heroin-

---

[147] *Id.*

[148] *Id.*

[149] Pradip K. Muhuri et al., Substance Abuse and Mental Health Services Administration, *Associations of Nonmedical Pain Reliever Use and Initiation of Heroin Use in the United States* (August 2013), *available at*: http://www.samhsa.gov/data/sites/default/files/DR006/DR006/nonmedical-pain-reliever-use-2013.htm.

[150] TN Dep't of Mental Health and Substance Abuse Services, *Message from Commissioner E. Douglas Varney on Heroin's Grip in our Cities and Suburbs* (Nov. 13, 2015), *available at:* https://www.tn.gov/behavioral-health/news/20176.

[151] *Id.*

related criminal activity, sharply on the rise, and said: "I'm saddened to see our friends and neighbors that have been struggling with opioid addiction now transitioning to heroin which is coming from the criminal underground street dealer."[152]

404. In a December 2016 publication of the Tennessee Medical Association titled "No Easy Fix: Tennessee's Doctors Take on The Opioid Abuse Epidemic," Dr. Roland W. Gray described the opioid epidemic as the "worst and deadliest drug epidemic in our nation's history."[153] He went on to say that "[t]here's good news in that we are prescribing significantly fewer opiates in Tennessee; the bad news is they are being replaced by a heroin epidemic. Tennesseans are rapidly turning to those drugs – they're available on the street and are cheaper and far more powerful than prescription opiates."[154]

405. According to the Tennessee Department of Health, heroin-associated overdose deaths are also on the rise, increasing from 147 in 2014 to 205 in 2015.[155]

406. Commissioner Dreyzehner has determined that "[t]here is a direct correlation between opioid addiction and heroin use."[156]

407. As set forth in a September 2016 report by the Tennessee Department of Mental Health and Substance Abuse Services, people with prior treatment admissions, people who inject

---

152 *Id.*
153 Roland W. Gray, *The Good News/Bad News About Tennessee's Opioid Epidemic*, 109 Tenn. Med.. 4, 23 (2016), *available at:* https://www.tnmed.org/Documents/TennMed-Qtr4-05FINAL.pdf.
154 *Id.*
155 Tenn. Dep't of Health, *1,451 Tennesseans Die from Drug Overdoses in 2015*, tn.gov (Nov. 15, 2016). Available at: http://tn.gov/health/news/46773.
156 *Working Group Report*.

opioids, people ages 25-34, and people who started opioid use after age 18 are all at increased risk for switching from prescription opioids to heroin.[157]

### M. The Baby Doe Plaintiffs' Neonatal Abstinence Syndrome was a Result of Defendants' Participation in the Illegal Drug Market

408. The biological mothers of the Baby Doe Plaintiffs became addicted to opioids and maintained their addictions using diverted opioids as a result of Defendants' participation in the illegal drug market. While Defendants callously and cynically profited from their addiction and the illegal market which fueled it, these women gave birth to the Baby Doe Plaintiffs, each of whom, from their first breaths to today, suffer from their *in utero* exposure to opioids.

#### 1. Baby Doe and Brother Doe

409. Mary Doe, the biological mother of Plaintiffs Baby Doe and Brother Doe, consumed illegal opioids during her pregnancy with each child.

410. Mary Doe first began taking opioids pursuant to lawful prescriptions beginning in her late teens.

411. Soon thereafter, Mary Doe became addicted to opioids.

412. As her addiction worsened, Mary Doe turned to the streets to buy pills on the black market to feed her addiction, including Roxicodone, hydromorphone, and Opana.

413. Still addicted, on June 18, 2013, Mary Doe gave birth to Brother Doe at Vanderbilt University Medical Center in Davidson County. Brother Doe was diagnosed with NAS and treated for withdrawal symptoms until he was discharged.

[157] K. Edwards, Tennessee Department of Mental Health & Substance Abuse Services, *Turning the Curve on Opioid and Heroin Abuse in Tennessee*, 14 (September 14, 2016).

414. Still addicted, on July 8, 2015, Mary Doe gave birth to Baby Doe at Vanderbilt University Medical Center in Davidson County. Baby Doe was diagnosed with NAS and treated for withdrawal symptoms until he was discharged.

415. Baby Doe and Brother Doe suffered tremendously following their births: arching their backs, refusing to eat, and crying uncontrollably as they suffered from withdrawal symptoms as a result of their opioid exposure.

416. Baby Doe and Brother Doe continue to suffer from numerous behavioral issues to this day, and their parents worry that they will have lasting learning disabilities and future addiction issues as a result of their drug exposure *in utero*.

**2. Baby Roe, Brother Roe, and Sister Roe**

417. Mary Roe, the biological mother of Baby Roe, Brother Roe, and Sister Roe consumed illegal opioid drugs during her pregnancy with each child.

418. Mary Roe first began taking opioids as a teenager pursuant to a lawful prescription after an accident.

419. Soon thereafter, she became addicted.

420. As her addiction worsened, Mary Roe turned to the streets to buy pills on the black market to feed her addiction, including Percocet, Roxicodone, Opana, Lortab, and Fentanyl.

421. Still addicted, on February 24, 2014, Mary Roe gave birth to Sister Roe at Centennial Women's Hospital in Davidson County. Sister Roe was diagnosed with NAS and was treated for withdrawal symptoms until she was discharged.

422. Still addicted, on December 2, 2015, Mary Roe gave birth to Brother Roe at Vanderbilt University Medical Center in Davidson County. Brother Roe was diagnosed with NAS and treated for withdrawal symptoms until he was discharged.

423. Still addicted, on May 15, 2017, Mary Roe gave birth to Baby Roe at Vanderbilt University Medical Center in Davidson County. Baby Roe was diagnosed with NAS and treated for withdrawal symptoms until he was discharged.

424. Baby Roe, Brother Roe, and Sister Roe suffered tremendously following their births: arching their backs, refusing to eat, and crying uncontrollably as they suffered from withdrawal symptoms as a result of their opioid exposure.

425. Baby Roe, Brother Roe, and Sister Roe continue to suffer from numerous behavioral issues to this day, and their parents worry that they will have lasting learning disabilities and future addiction issues as a result of their drug exposure *in utero*.

**3. Baby Smith**

426. Mary Smith, the biological mother of Baby Smith, consumed illegal opioids she obtained from the black market, including Percocet and Lortab, among others.

427. Still addicted, on May 1, 2020, Mary Smith gave birth to Baby Smith at Centennial Medical Center in Davidson County. The umbilical cord drug screen came back positive for morphine, hydromorphone, and hydrocodone. Baby Smith was diagnosed with NAS and treated for withdrawal symptoms until he was discharged into the custody of Mary Smith's cousin (who has since obtained legal custody of Baby Smith).

428. Baby Smith suffered tremendously following his birth: arching his back, refusing to eat, and crying uncontrollably as he suffered from withdrawal symptoms as a result of his opioid exposure.

429. Baby Smith continues to suffer from numerous behavioral issues to this day, and his guardian worries that he will have lasting learning disabilities and future addiction issues as a result of his drug exposure *in utero*.

430. The Baby Doe Plaintiffs' NAS and associated conditions are consequences of the illegal market in which the Defendants participated. Defendants knew that their acts and omissions with regards to the marketing, distribution, and dispensing of opioids would result in a community of addicts, that those addicts would likely seek opioids through illegal distribution channels, and that many of those addicts—such as Mary Doe, Mary Roe, and Mary Smith—would give birth to babies dependent on opioids.

431. The Baby Doe Plaintiffs are just six of the thousands of innocent infants victimized by Defendants' unlawful conduct. For years to come, these children will have to bear the psychological, physical, and financial burdens of these Defendants' campaign to addict America to opioids.

## THE THCLA DOES NOT APPLY

432. Tennessee's Healthcare Liability Act does not apply to this DDLA action or any other claims made in this lawsuit. While the THCLA applies to "any civil action…alleging that a health care provider or providers have caused an injury relating to the provision of, or failure to provide, health care services to a person," Tenn. Code Ann. § 29-26-101(a)(1), the DDLA is distinct in that defendants are liable only for "injury resulting from an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-105(a). Plaintiffs have no burden of establishing direct or proximate causation between defendants' alleged provision of health care services; instead, Plaintiff's evidentiary burden with regard to Defendants' conduct is to show "[t]he defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user." Tenn. Code Ann. § 29-38-106(b)(2)(B). Absent a causal link to the damages alleged herein, Defendants' conduct does not fall under the umbrella of the THCLA.

433. Without conceding that Tennessee's Healthcare Liability Act applies to any claim brought in this action, or that a certificate is required under the Tennessee Healthcare Liability Act for any claim brought in this action, and pled in the alternative, to the extent necessary, Plaintiffs have complied with the certificate of good faith requirement of the Tennessee Healthcare Liability Act, Tenn. Code Ann. § 29-26-101, *et seq*, which has been interpreted as a jurisdictional requirement. Pursuant to Tenn. Code Ann. § 29-26-122(a), a Certificate of Good Faith signed by the undersigned counsel is included as Exhibit A and incorporated herein by reference.

## DISCLAIMER

434. For the sake of clarity, and in the event any defendant seeks to remove this case or asserts that this pleading (or any other paper) raises any federal claim or federal question, the Baby Doe Plaintiffs expressly disavow any and all federal claims or questions related to opioids distributed by defendants as being a part of this lawsuit. Specifically, the Baby Doe Plaintiffs hereby expressly disavow any cause of action or claim for recovery related to opioids distributed by defendants that could give rise to federal subject matter jurisdiction under either 28 U.S.C. § 1331 (federal question) or 28 U.S.C. §1442(a)(1) (federal officer). The Baby Doe Plaintiffs also disavow any cause of action or claim for recovery related to opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract including but not limited to any Pharmaceutical Prime Vendor Contract.

## CAUSES OF ACTION

### COUNT I
### TENNESSEE DRUG DEALER LIABILITY ACT

435. The Baby Doe Plaintiffs incorporate all preceding and subsequent paragraphs by reference.

436. The Baby Doe Plaintiffs have been exposed to illegal opioids *in utero* because of their birth mothers' addiction to, purchase, and use of those illegal drugs. Those exposures provide them the right to sue for damages under the DDLA. Tenn. Code Ann. § 29-38-106(a)(2).

437. Mary Doe, the birth mother of Plaintiffs Baby Doe and Brother Doe, was an "individual drug user" under Tenn. Code Ann. § 29-38-104(4) whose illegal drug use attributable to illegal opioids resulted in *in utero* opioid exposure during her respective pregnancies with Baby Doe and Brother Doe. Tenn. Code Ann. § 29-38-104(4).

438. Mary Doe's opioid use was illegal in that she used opioids obtained without a valid prescription as required by Tenn. Code Ann. § 53-11-308(a).

439. Mary Doe bought and used illegal opioids throughout Davidson County, Tennessee, including Roxicodone, hydromorphone, and Opana. Under the DDLA, the legislative districts in Davidson County is the "place of illegal drug activity." Tenn. Code Ann. § 29-38-104(12).

440. Mary Roe, the birth mother of Plaintiffs Baby Roe, Brother Roe, and Sister Roe was an "individual drug user" under Tenn. Code Ann. § 29-38-104(4) whose illegal drug use attributable to illegal opioids resulted in *in utero* opioid exposure during her respective pregnancies with Baby Roe, Brother Roe, and Sister Roe.

441. Mary Roe's opioid use was illegal in that she used opioids obtained without a valid prescription as required by Tenn. Code Ann. § 53-11-308(a).

442. Mary Roe bought and used illegal opioids throughout Davidson County, Tennessee, including Percocet, Roxicodone, Opana, Lortab, and fentanyl. Under the DDLA, the legislative

districts in Davidson County is the "place of illegal drug activity." Tenn. Code Ann. § 29-38-104(12).

443. Mary Smith, the birth mother Plaintiff Baby Smith, was an "individual drug user" under Tenn. Code Ann. § 29-38-104(4) whose illegal drug use attributable to illegal opioids resulted in *in utero* opioid exposure during her pregnancy with Baby Smith.

444. Mary Smith's opioid use was illegal in that she used opioids obtained without a valid prescription as required by Tenn. Code Ann. § 53-11-308(a).

445. Mary Smith bought and used illegal opioids throughout Davidson County, Tennessee, including Percocet and Lortab. Under the DDLA, the legislative districts in Davidson County is the "place of illegal drug activity." Tenn. Code Ann. § 29-38-104(12).

446. Defendants knowingly participated in the production, procurement of the originally diverted prescription, and/or distribution of prescription opioids into the illegal market that reached the Baby Doe Plaintiffs' community during all times relevant to this complaint.

447. For purposes of the DDLA, Defendants' "illegal drug market target community" is the entire state of Tennessee, because Defendants participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug."[158] Tenn. Code Ann §§ 29-38-104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely

---

[158] As noted in ¶ 2 and elsewhere above, this distribution does encompass opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that each of the Drug Producer Defendants far exceeded the four-ounce level, and the same holds true as to the Distributor Defendants and Pharmacy Chain Defendants. The Pill Mill Defendants also exceed the four-ounce level.

448. The Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants all recognized that they had a responsibility to maintain effective controls against diversion, not to procure or fill suspicious orders, not to convince prescribers to write scripts without a valid medical purpose, and not to supply channels of distribution that they knew or reasonably expected would result in diversion. Nevertheless, as described above and upon information and belief, they violated these Tennessee responsibilities through the various acts referenced herein.

449. The Producer Defendants also committed various other acts intended to facilitate the marketing or distribution of illegal opioids that reached the Baby Doe Plaintiffs for purposes of Tenn. Code Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference. Upon information and belief,

a. engaging in a mass marketing campaign to downplay the risks of addiction from long-term use of opioids of non-cancer pain;

b. taking actions that violated DEA and FDA requirement or guidelines regarding the marketing and promotion of their drugs and/or suspicious order monitoring;

c. utilizing front groups and key opinion leaders to spread misinformation regarding the risks of addiction and the signs of addiction;

d. utilizing marketing teams to devise ways to overcome the legitimate concerns of Tennessee prescribers regarding long-term use of opioids;

e. successfully encouraging Tennessee prescribers to engage in prescription practices that defendants knew and expected would drive up addiction rates;

f. oversupplying Tennessee and Plaintiffs' community with opioids, knowing that the oversupply would necessarily feed and expand the black market;

g. targeting the highest-volume Tennessee prescribers for sales efforts and calling on these prescribers repeatedly to convince them to prescribe more opioids;

h. using volume-based bonuses and commissions for sales representatives with respect to a highly addictive and widely abused narcotic, and otherwise encouraging and rewarding sales representatives for doing business with Tennessee pill mills and other over-prescribers;

i. knowingly establishing business relationships with Tennessee pill mills and over-prescribers to compete for their business by convincing them to prescribe more opioids, including high-volume prescribers in small, rural Tennessee communities who were prescribing opioids at unjustifiable levels;

j. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after it was clear, even by defendants' own stated criteria, that those prescribers were engaging in highly suspicious prescribing practices or criminal conduct;

k. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after receiving reports from law enforcement that the prescribers and pharmacies were supplying drug addicts and the illegal market;

l. establishing new accounts with high-volume opioid prescribers without due diligence, knowing that the new account may be a pill mill;

m. providing patients or Tennessee prescribers incentives to prescribe more opioids;

n. convincing naïve Tennessee doctors willingly to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale;

o. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids when defendants knew that those prescribers were likely engaging in unlawful conduct and feeding the illegal drug market;

p. incentivizing sales representatives to do business both with Tennessee pill mills and with pharmacies supplying pill mills (and financially rewarding those sales associates for doing so);

q. filling suspicious orders intended for distribution in Tennessee despite knowing that the orders reflected diversion;

r. implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded in Tennessee and elsewhere;

s. filling orders that defendants had subjectively identified as suspicious before undertaking or completing an investigation into those orders;

t. permitting sales representatives to call on or prescriber or pharmacy even after internally recommending that the entity be reported to the government;

u. continuing to call on pill mill prescribers and associated pharmacies even after being told by law enforcement that they were likely feeding the illegal drug market;

v. collaborating with the Drug Distributors to provide sham justifications to fill suspicious orders;

w. placing primary or sole responsibility for suspicious order monitoring in the hands of a commission/volume bonus-based sales force with an inherent conflict of interest;

x. allowing inherently conflicted sales representatives to "clear" suspicious orders without any independent investigation;

y. Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

z. allowing sales associates to determine whether to self-report their best customers even where the stated criteria for reporting diversion are met; and

aa. supplying outlandish volumes of prescription opioids to rural Tennessee communities far exceeding any conceivable medical need.

450. The Distributor Defendants and the Pharmacy Chain Defendants also committed acts intended to facilitate the marketing or distribution of illegal opioids that reached the Baby Doe Plaintiffs for purposes of Tenn. Code Ann. § 29-38-104(9).[159] These acts are detailed in the

[159] As noted in ¶ 2 above, this distribution does not include opioids distributed by defendants to federal customers under the authority or direction of a federal officer, federal agency, or pursuant to a federal contract, including any Pharmaceutical Prime Vendor Contract.

preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

a. providing volume-based bonuses or commissions to sales representatives relating to shipment of a highly addictive and widely abused narcotic;

b. incentivizing or otherwise rewarding sales personnel who did business with pharmacies that supply pill mills and other over-prescribers;

c. routinely filling suspicious orders, including that should have been flagged as suspicious and impounded based on the Drug Distributors' own stated criteria (such as orders of unusual size or frequency);

d. routinely filling orders, including plainly suspicious orders, without due diligence; establishing new accounts without due diligence;

e. implementing a suspicious order marketing program that was designed to fail;

f. making adjustments to the suspicious order monitoring program to make it less effective on purpose, such as changing thresholds for customers that initially exceeded them;

g. providing sham justifications to "clear" orders from being impounded or accounts from being frozen through chargeback restrictions;

h. intentionally seeking out relationships with pain clinics or pharmacies that serve pain clinics;

i. Choosing not to report (*i.e.*, concealing) the identity of suspicious customers and suspicious orders from Tennessee Board of Pharmacy and law enforcement entities.

j. shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need, where the volume of pills far exceeded the number of people, and where the prescription per capita rate was exceedingly high; and

k. shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee, despite reports from law enforcement, firsthand observations, or other knowledge that the pharmacy was honoring pill mill prescriptions *en masse.*

451. The Pill Mill Defendants also committed acts intended to facilitate the marketing and distribution of illegal opioids that reached the Baby Doe Plaintiffs for purposes of Tenn. Code

Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference.

452. As a result, the Producer Defendants, Distributor Defendants, and Pharmacy Chain Defendants knowingly disseminated massive quantities of prescription opioids to suspect physicians, pharmacies, and into the black market, including to "pill mills" such as the Pill Mill Defendants

453. The Defendants committed acts intended to facilitate the marketing or distribution of illegal opioids that resulted in the Baby Doe Plaintiffs being exposed to opioids *in utero*. Tenn. Code Ann. § 29-38-104(9).

## PRAYER FOR RELIEF

**WHEREFORE, the Baby Doe Plaintiffs demand judgment as follows:**

1. Economic damages in an amount to be proven at trial. Under the DDLA, "[e]conomic damages, including, but not limited to: the cost of treatment and rehabilitation, medical expenses, loss of economic or educational potential, loss of productivity, absenteeism, support expenses, accidents or injury, and any other pecuniary loss proximately caused by the illegal drug use" described in this Complaint. Tenn. Code Ann. § 29-38-106(c)(1);

2. Non-economic damages in an amount to be proven at trial. Under the DDLA, "[n]on-economic damages, including, but not limited to, physical and emotional pain, suffering, physical impairment, emotional distress, mental anguish, disfigurement, loss of enjoyment, loss of companionship, services and consortium and other nonpecuniary losses proximately caused by an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-106(c)(2);

3. Exemplary/punitive damages;

4. Awards from all Defendants, including but not limited to the costs and disbursements of this action, reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses as provided by the common fund doctrine and other applicable law pursuant to Tenn. Code Ann. §29-38-106(c)(3) (4)-(5);

5. Declaratory relief;

6. All other remedies and relief available under law; and

7. Such other and further relief as the Court deems just and proper.

**The Plaintiffs demand a trial by jury on all issues <u>except</u> for attorney's fees and costs.**

Filed on this 14th day of April 2025

Respectfully submitted,

*/s/ Tricia R. Herzfeld*

**HERZFELD SUETHOLZ GASTEL LENISKI AND WALL, PLLC**
Tricia R. Herzfeld (BPR #26014)
Joe P. Leniski, Jr. (BPR #22891)
Anthony A. Orlandi (BPR # 33988)
The Freedom Center
223 Rosa L. Parks Avenue, Suite 300
Nashville, TN, 37203
Telephone: (615) 800-6225
tricia@hsglawgroup.com
joey@hsglawgroup.com
tony@hsglawgroup.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served via electronic mail on this 14th day of April, 2025 to all counsel of record:

William B. Hawkins III
Aaron Winters
Hawkins Hogan, PLC
205 17th Ave. North, Cte. 202
Nashville, TN 37203
whawkins@hawkinshogan.com
awinters@hawkinshogan.com
***Attorneys for Del Mar Medical, Inc. d/b/a Pardue's Pharmacy***

Robert A. Peal
Sims Funk, PLC
3322 West End Ave., Ste. 200
Nashville, TN 37203
rpeal@simsfunk.com
***Attorney for Hemal Mehta***

Matthew J. Evans
William G. Wojcik, II
Kay Griffin, PLLC
900 S. Gay Street, Ste. 1810
Knoxville, TN 37902
Matthew.evans@kaygriffin.com
wwojcik@kaygriffin.com
Cmalloy@kaygriffin.com
***Attorneys for Walgreens Co.***

Kyle Mothershead
Relentless Advocacy, PLLC
7000 Executive Center Drive, Ste. 240
Brentwood, TN 37027
kyle@relentlesslaw.com
***Attorney for Timothy Abbott***

Joshua L. Burgener
Dickinson Wright, PLLC
424 Church Street, Ste. 800
Nashville, TN37203
jburgener@dickinsonwright.com
***Attorney for Walmart, Inc. and Wal-Mart Stores East, L.P.***

Chris L. Vlahos
Jenna L. Harris
Ritholz Levy Fields, LLC
131 S. 11th Street
Nashville, TN 37206
cvlahos@rlfllp.com
jharris@rlfllp.com
***Attorneys for Allergan Finance, LLC***

Taylor B. Mayes
Andrew D. Tharp
Butler Snow, LLP
150 Third Avenue South, Ste. 1600
Nashville, TN 37201
Taylor.mayes@butlersnow.com
Andrew.tharp@butlersnow.com
***Attorneys for Johnson & Johnson, Inc. and Janssen Pharmaceuticals, Inc.***

Stuart A. Burkhalter
Riley & Jacobson, PLC
1906 West End Avenue
Nashville, TN 37203
sburkhalter@rjfirm.com
***Attorneys Amneal Pharmaceuticals, Inc., Amneal Pharmaceuticals, LLC, Teva Pharmaceuticals USA, Inc., Watson Laboratories, Inc., Actavis, LLC, and Actavis Pharma, Inc.***

Melanie S. Carter
Justina L. Byers
Terry M. Henry
Blank Rome LLP
One Logan Square
130 N 18th Street
Philadelphia, PA 19103-6998
Melanie.Carter@BlankRome.com
Terry.Henry@BlankRome.com
Justina.Byers@BlankRome.com
***Attorneys for Teva Pharmaceuticals USA, Inc., Actavis, LLC, Actavis Pharma, Inc., and Watson Laboratories***

Lela M. Hollabaugh
Bradley Arant Boult Cummings, LLP
1600 Division Street, Ste. 700
Nashville, TN 37203
lhollabaugh@bradley.com
***Attorneys for Cardinal Health, Inc.***

Kyle W. Eiselstein
Meredith C. Lee
Miller & Martin PLLC
1200 Volunteer Building
832 Georgia Avenue
Chattanooga, TN 37402
kyle.eiselstein@millermartin.com
Meredith.lee@millermartin.com

***Attorneys for AmerisourceBergen Drug Corporation***

Conor B. O'Croinin
100 East Pratt St., Ste. 2440
Baltimore, MD 21202
cocroinin@zuckerman.com

C. Scott Johnson
Spears, Moore, Rebman & Williams, PC
P.O. Box 1749
Chattanooga, TN 37401
csj@smrw.com

***Attorneys for CVS Pharmacy, Inc.; CVS TN Distribution, LLC; CVS Indiana, LLC; Tennessee CVS Pharmacy, LLC***

Cindy Scott
1412 Semmes Ave. #2102
Richmond, VA 23224
***Pro Se***

Meggan Bess Sullivan
424 Church Street, Ste. 2000
Nashville, TN 37219
msullivan@chapmanlawgroup.com
***Criminal Attorney for Heather Marks***

*/s/ Tricia R. Herzfeld*
Tricia R. Herzfeld